MEFFORD *v.* STATE

[No. 238-A, September Term, 1963.]

BLACKBURN *v.* STATE

[No. 238-B, September Term, 1963.]

(Two Appeals in One Record)

498

*Decided July 7, 1964.*

The cause was argued before the entire Court.

*Thomas J. Hatem* for Frederick Morris Mefford, one of the appellants.

*Larry P. Scriggins* and *E. Clinton Bamberger, Jr.,* for Earl LeRoy Blackburn, the other appellant.

*Loring E. Hawes* (in the *Mefford* Case) and *Franklin Goldstein* (in the *Blackburn* Case), *Assistant Attorneys General,* with whom were *Thomas B. Finan, Attorney General,* and *Edwin H. W. Harlan, State's Attorney for Harford County,* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Frederick Morris Mefford and Earl LeRoy Blackburn were indicted jointly by the Harford County Grand Jury for the fatal shooting of a gas station attendant in the course of a robbery. Each was convicted, in separate trials, by Judge Day and Judge Edwin Harlan (of Baltimore, specially assigned), sitting without a jury, of murder in the first degree, robbery and robbery with a deadly weapon, and given concurrent sentences of death for the murder, ten years for the robbery, and twenty years for the robbery with a deadly weapon. Their appeals to this Court were argued on the same day, and since they arise from the same occurrence, have many common facts, and call for evaluation of, and decision on, similar principles, we deem it appropriate to consider and dispose of them in one opinion.

In the early morning hours of Sunday, March 4, 1962, one Snider, who was tending a gasoline service station on Route 40 at Joppa in Harford County was robbed at gun point by two men of some $103 of the station owner's money. The men left and soon after one of them returned and shot Snider in the head. He died several hours later. Not long after the shooting he said he had been held up and robbed by two men, one with reddish bushy hair and the other with dark hair. He did not recognize the men.

At Mefford's trial, a nearby restaurant attendant, who had talked to Snider after the shooting, could not say that Snider had identified the man who returned and shot him, but at Blackburn's trial, the witness said he was almost sure Snider had told him the bushy haired man had done it. The State proved at each trial that a cartridge case and a spent bullet which were found at the scene of the crime had been fired from a .32 calibre Savage pistol owned by Mefford, and by him turned over to the police, as well as that Mefford owned a 1955

red Chevrolet hardtop car with automatic transmission, and that such a car had been seen along Route 40 north of Baltimore during the late night of March 3 and the early morning of March 4, with its two male occupants surveying gasoline stations, and that within minutes of the time of the holdup the car had been observed on Route 40 heading towards Joppa.

It was brought out also in each trial that on April 16, 1962, a filling station on Route 40 at Chesaco, in Baltimore County, had been robbed by men who used the techniques used by the robbers at the station at Route 40 and Joppa. The State police who were investigating the Joppa case and the Baltimore County police assigned to the Chesaco case began to cooperate in an effort to solve both crimes, believing them to have been committed by the same individuals.

Mefford gave oral confessions and a written confession and Blackburn made a written confession, and each said the other had done the actual shooting.

Mefford contends that the evidence was insufficient to support the convictions and that his confessions were involuntary. A subsidiary contention is that a motion for a mistrial should have been granted. The State objected to a question by Mefford's lawyer on cross-examination and the objection was sustained. After an extended colloquy, the ruling was changed and the question was allowed to be answered. Appellant contends that he was deprived of effective cross-examination because of the delay between the first asking of the question and the time the answer was allowed. We believe that whatever effect the answer was intended to produce and capable of producing was not lost on the Judges, who were the triers of fact (and may have been emphasized). We find no error in the ruling complained of.

Blackburn contends that his confession should have been excluded because involuntarily made and because, even if voluntary, it was inadmissible by reason of a failure to hold a preliminary hearing and a denial of his requests to be immediately charged and afforded counsel. A subsidiary contention is that statements of his wife to him at the police station, testified to by a policeman, were hearsay and should not have been admitted. Appellant (apparently as a prelude to testimony he

later gave that at the meeting with him, his wife was crying and in a "state of frenzy" because the Baltimore County police had grilled her for five hours to make her say she could not support her husband's alibi for the night of the murder) asked a State trooper on cross-examination whether Mrs. Blackburn was not "crying and hysterical." The witness replied that she was crying "after she talked to her husband" but was not hysterical. On redirect examination the Judges permitted the trooper to be questioned on what Mrs. Blackburn said because the matter had been opened up by the appellant, her statements were made in Blackburn's presence and were relevant on the reasons for her crying. (Among other things, she asked Blackburn "why he did it" and said "there was no reason to kill a man.") After Blackburn had testified as to why he thought she was crying, a Baltimore County detective and the State trooper, both of whom overheard the conversation between Blackburn and his wife, were called in rebuttal. They testified that she said she wished her husband had stayed home and not "run around" with Mefford and that in the course of the conversation Blackburn had told her that he and Mefford had done the thing that had happened at the service station in Joppa and he did it to protect her and their six-year-old daughter Debbie (Blackburn testified that Mefford had threatened him on occasion with harm to Debbie if he would not take part with Mefford in holdups). They said it was then Mrs. Blackburn began to cry and say that if he had stayed home where he belonged with her and Debbie it would not have happened.

No question of an improper adoptive admission of Mrs. Blackburn's remarks by Blackburn, while in police custody, is here presented, as the appellant contends. Under the circumstances we have detailed, we see no prejudicial error in the admission of the testimony complained of. The State was entitled to rebut Blackburn's claim that his wife was crying because of police treatment and to show that Blackburn, knowing the police were listening, made incriminating admissions, or confessed, in the course of a conversation with his wife, a conversation he had requested he be allowed to have with her.

## Mefford's Contentions

The argument that the evidence was insufficient to convict is made because Snider said he did not recognize the men who robbed him. Whatever the reason—perhaps the shortness of the time they had worked at the same station some two years before, or the stress and effect of the shooting—the confessions of Mefford (which we find to have been properly admitted), considered with the proof of the corpus delicti and the facts that Mefford's pistol was used to shoot Snider, his motive for the shooting (feared recognition by Snider) and the presence of a car like Mefford's near the scene at the time of the shooting, certainly properly permitted the triers of fact to have been persuaded, as they were, beyond a reasonable doubt, that Mefford was one of the two guilty men.

Mefford's claim on the inadmissibility of his confessions is that he was illegally arrested and illegally detained and was denied the right to call his family or a lawyer. He was arrested about ten-thirty in the morning on April 20 by the Baltimore County police who wanted to question him about the robbery at Route 40 at Chesaco and, incidentally, about the case at Route 40 and Joppa. He was interrogated during the day and then placed in a cell in which there was a metal bunk and toilet facilities. The next day, Saturday, he was again questioned, and at about 4:30 was taken to the Essex police station, which was better equipped for overnight prisoners, for the weekend. He was not questioned Saturday night, Sunday (which was Easter), or Sunday night but, he says, permitted to sleep when he wanted to, without interruption. He was fed regularly although he says the meals were not good, particularly one consisting of a cold hamburger and a cup of cold coffee. He says he asked on numerous occasions for a chance to call his family and a lawyer, but was refused. He says also that he was told he would be held seventy-two hours and then released, but picked up again and held for a similar period, and so on, until he confessed. He does not claim he was otherwise in any way coerced or that he was physically manhandled and says the County police did not break him down. Indeed, he does not claim (and there is no testimony that it was a fact) that the County police questioned him about the crime the State police

were investigating. On Monday morning he was brought back to Towson and, after being questioned for a short time, was given back his belongings, including a knife, and released. He was arrested outside the Towson police headquarters by Corporal Seekford, of the State police, who was in charge of the investigation of the Joppa case, and who had been told by the County police that they had in custody a "particular suspect" in the Joppa case whom they were going to release. Mefford's wife had called the County police during the weekend and had been told she could see her husband Monday at Towson. When she arrived Mefford had been released but he left with the police his endorsed paycheck—which she was seeking—and the police gave it to her. His reason for leaving the check, he told the police, was that he was not going home and he was not afraid to leave the endorsed check with the police because, he said, "[i]f you can't trust the police, who can you trust?"

Corporal Seekford took Mefford to Benson Barracks near Bel Air where, Mefford says, he was given the first "decent" meal he had had since his arrest. After lunch Seekford took Mefford to the North East Barracks where Sergeant Stacey, the polygraph expert, had his headquarters and his apparatus. Stacey talked to him for an hour or so, and then he was given supper. After supper Stacey again questioned Mefford for an hour and a half. The officers testified that Mefford at that point volunteered that he would clear up the Route 40 cases if he could see his wife and arrange for the sale of his car so she would have some money. This suggestion came from him, not from the police. As a result of the questioning at North East Barracks, Corporal Seekford took Mefford on a trip in a police car. They left about ten that night (Monday, April 23) and, driving slowly, with a stop for a soft drink, arrived at Mefford's home in Armistead Gardens near Baltimore about an hour later. On the way Mefford says he gave Seekford the knife he had (with which, he said, he could have "inflicted" the officer, the State police not, apparently, having searched him). Mefford greeted his wife and child and then got from her the keys to a 1950 Plymouth car, which was in their garage. A search of the trunk of the Plymouth for the murder weapon, which Mefford expected to be there, produced nothing. Seek-

ford next drove Mefford past 723 Luzerne Avenue in Baltimore, where Blackburn lived, and then out Route 40 to Chesaco, where Mefford made several telephone calls, including one to his brother-in-law, Irvin Ellis, who lived near Reisterstown. Accompanied by Detective White, of the County police, who had joined them at Chesaco, they drove to Ellis' place where, at Mefford's request, Ellis gave Seekford a white bag in which were a .32 calibre Savage pistol—the murder weapon—and a sawed off shot gun (Ellis had taken them from the Plymouth to protect Mefford when he learned he was in police custody). Seekford took Mefford to Towson where he was incarcerated until morning and then returned him to the North East Barracks. (Seekford and other police officers went in the early morning hours to arrest Blackburn at Luzerne Avenue, after Mefford had been taken to Towson.)

On the trip during the night of the 23rd, Mefford at various times gave a full account of the robbery and murder and of the participation in it of Blackburn and himself, attributing the shooting of Snider with his (Mefford's) gun to Blackburn. In the morning of April 24, he repeated the confessions to a police stenographer in the form of answers to questions asked by a police officer. The stenographer transcribed the statement but Mefford would not sign it until he saw his wife, as the police had told him the day before he could, and told her about the case and the circumstances, first hand. Mrs. Mefford was brought to the Barracks about eleven o'clock on Tuesday, April 24, and she and Mefford talked for fifteen minutes. She went home and he signed the confession.

The witnesses were sequestered at both trials. Each of the police officers who had any part in the confessions of Mefford, or contact with him in connection therewith, testified in detail that no threats were made or coercion applied and no inducements offered or promises made to procure any part or the whole of any confession. The Baltimore County police did not testify. After Corporal Seekford, in his testimony as to the events leading up to Mefford's oral confession, mentioned that he had been in custody of the County police for three days, Mefford's counsel suggested that the State had the burden of pro-

ducing the County police as part of a showing of voluntariness. The State offered to do so, but the court said it did not think it necessary at that point, and Mefford's counsel seemingly acquiesced. After Mefford had testified, the State again offered to produce the County policemen if the court thought it necessary. The court said that Mefford's testimony, assuming it to be true, showed that the treatment he received from the County police did not at the time cause him to break down and had not influenced his subsequent confessions, and admitted both into evidence. Mefford's counsel then again seemingly acquiesced.

Mefford, in testifying on voluntariness of his confessions, reiterated from the stand that all he had said in them was true. He said he thought the State and County police would "bounce" him back and forth between them if he did not confess, although he admits the State police did and said nothing to make him think this. He did not ask the State police for a lawyer at any time, or suggest that he wanted one, because the County police had refused, he said, to let him call one. He admits that the State police treated him very well and, in addition to his testimony from the stand to that effect, in his written confession in answer to "how have you been treated since you have been in the custody of the Maryland State police," he replied: "That's a good question. How do you put that. Fair. Good, I guess. Couldn't say excellent. Could say like a gentleman, but that's not my language."

He told the court that the police did not make his confession a condition precedent to his seeing his wife, but that the offer was his. When asked by the court if he had volunteered to give the written statement if he saw his wife, he agreed he had, saying "[u]nder the situation and the strain I was in I had no other choice." Immediately thereafter he confirmed to the court that he had been well treated by Seekford and Stacey, the only State policemen with whom he had been in contact, and could not be specific about his "situation" and the "strain" which left him no choice.

We think the trial judges had full reason to conclude, as they did, that Mefford's confessions were the voluntary prod-

ucts of a free and unconstrained will, which, as a matter of fact, had not been overborne or compelled.

### Blackburn's Contentions

Blackburn, who, among other things, was a barber (who had finished high school and had taken college courses) despite the fact that two fingers on one hand cannot be straightened except involuntarily with resulting pain, and that he must wear a brace for a back condition resulting from something akin to a slipped disc, came home from work on the evening of April 23 to an empty house, his wife having left him sometime before to live with her mother. He had a long telephone talk with Irvin Ellis, Mefford's brother-in-law (who had introduced him to Mefford), who told him Mefford was in the hands of the police and that he better get a lawyer. He went to bed without eating because he had a headache. About three in the morning, he was awakened by a knocking on the door. He garbed himself in pants, a T shirt and slippers and went downstairs and out into an alleyway, and was there arrested and handcuffed behind his back. The police say he did not want to go back into the house for other clothing, he says they would not let him do so. He was taken to Towson police headquarters, interrogated for an hour and then put in a cell, which he says had only a metal bunk, was so cold he shivered, and was completely dark (the County police say the temperature was 70°, as it always is in the modern building, winter and summer, and the cell was lighted), until 8:30 a.m. when he was fingerprinted by pressing the fingers of his afflicted hand straight. He says this was very painful—the police say he did appear to wince. He was then, he says, given a cup of cold coffee, half of which he spilled because he was cold and nervous. The police say he was given a cup of coffee and a bun. He says he was not given lunch. Two County policemen testified that he was.

In the afternoon he was taken to the State police barracks at Benson near Bel Air. He says that because he did not have his back brace and because, on the ride, he was handcuffed behind so that he was forced to lean forward, his back hurt and he could not walk when he got out of the car (he made the same claims as to subsequent trips). All the policemen who saw

him while he was in custody say he would sometimes limp for a minute or so when he first got out of a car but that except for this he walked and sat completely normally. (Irvin Ellis testified that some months before, when Blackburn was a trusty, his job was cutting grass and doing other physical labor at the State Office Building in Baltimore, and that about that time he, Ellis, had played football with him.)

At Benson Blackburn was questioned for a few minutes by Lt. Hanley. Blackburn says Hanley told him he was not going to be released until they got what they were looking for and they would keep working on him until they did. He testified he told Hanley to charge him if he had anything on him so he could get a lawyer, but he got no response. (Although Blackburn says in his brief that he repeatedly asked the police for a lawyer and was either denied the opportunity to call one or was ignored, in his testimony he says that when he was first arrested he several times asked the Baltimore County police, to whom he did not confess, as once he did Hanley, to be charged if they had anything "on him" so he could then get a lawyer—apparently as an indigent person, since he testified he had no money when he was arrested and, at his trial, was represented by a lawyer supplied by the State.)

Blackburn's recollection of what Hanley told him was completely different from that of Trooper Wellman, who said Hanley urged Blackburn to talk, after telling him in terms that they would promise him nothing and advising him of his right either to talk or, without prejudice, to remain silent, and to attempt to persuade him to take a lie detector test, and that Blackburn said he knew his rights. Blackburn frankly admits that, after discussing such a test with Hanley, he agreed to take one, if he could have twenty-four hours rest, a bed with a mattress and three good meals. Hanley agreed to these conditions. An hour later a trooper came and ascertained from Blackburn where to reach his wife so access could be gained to his apartment in order to get him clothing. Blackburn furnished the information and told the trooper the clothing he wanted. Two hours later, the trooper was back with the requested clothing. Blackburn was then taken to the North East Barracks and

placed for the night in a cell in which there was a bed with a mattress and blankets. Blackburn says that while he was in custody he was fed only sandwiches and milk and regurgitated what he ate and drank—with the exception of one sandwich—into the toilet in his cell. All the police officers who had an opportunity to judge say he was given full meals at the proper hours and apparently both ate and retained them (Blackburn often quibbled on the stand as to matters on which he had heard testimony from the officers. For example, they said one dinner he was given consisted of steak, french fried potatoes and cole slaw. He said there was no steak—only a little dried up piece of meat.).

Sergeant Stacey, after advising Blackburn of his right to answer or not to answer, conducted a preliminary examination of him on the morning after he was brought to North East Barracks. After lunch Blackburn was given the lie detector test and, when he asked what it showed, was told it revealed a "little deception." Stacey said Blackburn never made to him any request of any kind for counsel.

Blackburn argues that the subtle "techniques and circumstances" of the interrogations, such as constant repetitions suggesting his guilt, the physical position of Stacey during the lie detector test so close to Blackburn that the moisture from the former's mouth was transmitted to the latter's face, and a rhetorical question as to what he thought a jury would do when Mefford told them Blackburn had shot Snider, illegitimately induced his confession. Stacey and other police witnesses deny completely Blackburn's version of how the interrogations and the lie detector test were conducted. Blackburn's account of his reaction to being told that Mefford was accusing him of the actual shooting was that first he repeated his request that he be charged so he could get a lawyer, and second he asked to be allowed to confront Mefford and to see his wife. Both latter requests were immediately granted. When Mefford's statement was read to Blackburn (apparently in part by Mefford himself), he said he had heard enough and what he had to do now would be easier to do. He then talked to his wife and learned that she would not support his alibi that he was home in bed the night of Snider's murder.

The combination of Mefford's accusation of Blackburn and his wife's inability or unwillingness to support his alibi apparently were the blows that persuaded him that he might as well confess, rather than any improper or unlawful techniques of the police, subtle or direct.

We find that the trial judges permissibly could, as they did, both preliminarily in passing on admissibility and then as the triers of fact, find Blackburn's confession to have been in fact voluntary and not the result of an overborne will, not the product of either police stick or carrot.

### The Law of the Cases

Mefford's arrest, on the record, was illegal. The State argues that Corporal Seekford had probable cause, as a result of his investigation of the case and from what the County police told him, to believe Mefford had committed the felonies at Route 40 and Joppa. It well may be that he had, but the record shows no more than that he considered Mefford a "particular suspect," to use his words. Suspicion, although strong, is not the equivalent of probable cause. *Braxton v. State*, 234 Md. 1, 4.

Blackburn's arrest, on the other hand, was legal for, after Mefford had confessed to Seekford and had given his confession support by turning over the murder weapon, Seekford from these facts and his prior knowledge of the case had probable cause to believe that Blackburn was Mefford's confederate, as the latter claimed, and the right to return that night to Blackburn's home and arrest him.

Blackburn has no ground to urge, therefore, as Mefford has, that his confession was involuntary as a matter of law, and inadmissible, simply because it was given while he was in custody after an illegal arrest under the doctrine of *Wong Sun v. United States*, 371 U. S. 471, 9 L. Ed. 2d 441. The contention will not presently aid Mefford, for this Court has held that *Wong Sun* was not intended to, and does not, control prosecutions in State courts and that the rule of the Supreme Court in such cases (*Culombe v. Connecticut*, 367 U. S. 568, 6 L. Ed. 2d 1037) and that of Maryland remains that the critical test of admissibility of a confession is whether, under all circumstances, it was, in actuality, voluntary. *Prescoe v.*

*State,* 231 Md. 486; *Stewart v. State,* 232 Md. 318; *Peal v. State,* 232 Md. 329; *Bean v. State,* 234 Md. 432.

We think the circumstances attending the confessions of Mefford and Blackburn do not require a reversal of the trial judges' findings that they were voluntary. Mefford had been in custody some four days when he first confessed, but had been allowed complete rest from Saturday night to Monday morning, when he was again arrested after his release by the County police. The finding of the trial court that the County police confinement did not break down Mefford's will or induce his later confession is supported by the testimony in the case. There was a significant break in the confinement complained of, and in his attitude towards it, for, as he himself frankly said, he was well treated by the State police and had no reason ever to believe while in their custody that such treatment would not continue whether or not he confessed. What we said in *O'Connor v. State,* 234 Md. 459, 461, where the prisoner was taken from the custody of the New Jersey police by Maryland officers and confessed to the latter, and the defense was that the confession was involuntary because of mistreatment in New Jersey, is apposite here: "Any connection between the alleged mistreatment by the New Jersey police and his statements to the Maryland police was effectively broken, as the trial court found."

There was no unduly long questioning, no persistent hammering by relays of officers, no physical mistreatment, no deprivation of rest or food in either Mefford's or Blackburn's case. Neither was held incommunicado. Mefford was taken to see his wife the night of the day the State police arrested him, and she was brought to see him the next morning. Blackburn's wife was told where he was when the State trooper went to see her to get clothing, and she was brought to see him. The transfers of the prisoners from station to station were all made for legitimate purposes. The failure to have preliminary hearings is not of material significance on the matter of the voluntariness of the confessions. *O'Connor v. State, supra; Shorey v. State,* 227 Md. 385; *Hardesty v. State,* 223 Md. 559.

The remaining question arises from the complaint of Mefford and Blackburn, each that he was denied counsel and that this made his confession involuntary. Mefford freely concedes

that he made no request for counsel while he was in the custody of the State police. Blackburn never asked for counsel except as a part of a request that he be immediately charged (and this the trial judges could have concluded before he agreed to take the lie detector test on his conditions). Neither claims that ever was he told or led to believe he could have a lawyer only after he confessed.

Prior to the decisions of the Supreme Court in *Haynes v. Washington,* 373 U. S. 503, 10 L. Ed. 2d 513, and *Escobedo v. Illinois,* 378 U. S. 478, 32 U. S. L. Week 4605, there could have been no doubt that the denial of counsel between the time of arrest and the time of confession would not, of itself, have affronted due process as guaranteed by the federal constitution, since it would not necessarily have indicated an overborne or compelled will and, so, a failure to meet the controlling test of voluntariness in fact. The dissenting opinion of the four-member minority in *Haynes* and the cases of *Crooker v. California,* 357 U. S. 433, 2 L. Ed. 2d 1448, *Cicenia v. LeGay,* 357 U. S. 504, 2 L. Ed. 2d 1523, and *Lisenba v. California,* 314 U. S. 219, 86 L. Ed. 166, made this clear. This Court often has so held. *Miller v. State,* 231 Md. 158; *Jones v. State,* 229 Md. 165; *Bagley v. State,* 232 Md. 86; *Bean v. State, supra.* When the present case was tried below and when it was argued before us, the Supreme Court had not yet decided *Escobedo,* and both Mefford and Blackburn relied heavily on *Haynes,* which we think plainly is distinguishable on the facts and does not go nearly as far in its holdings as both appellants claim it goes.

In *Haynes* the four members of the Supreme Court who, in *Crooker, Cicenia, Ashdown v. Utah,* 357 U. S. 426, 431, 2 L. Ed. 2d 1443 (dissenting opinions), and *Spano v. New York,* 360 U. S. 315, 324, 326, 3 L. Ed. 2d 1265, and *Culombe v. Connecticut,* 367 U. S. 568, 637, 6 L. Ed. 2d 1037, *supra* (concurring opinions) were in the minority in their view that denial of request for counsel by a suspect in custody is a denial of "the Assistance of Counsel" guaranteed by the sixth and fourteenth amendments of the Constitution of the United States and that a confession obtained after such a denial cannot be used as evidence against the suspect. In *Haynes* they did not

persuade a fifth member of the Court to base the decision of the Court on that new flat proposition. See *DeToro v. Pepersack* (C. A. 4), 332 F. 2d 341. Rather, the Supreme Court held that where there was no real contradiction of the essentials of the prisoner's story that he repeatedly made specific requests for permission to call an attorney and his wife over a sixteen-hour period, during which he was held incommunicado (as he was for some five days after he confessed) and was as often told by the police he could make the calls only after he confessed (and, as he justifiably understood it, continue to be held incommuncado until he did), the prisoner, under the totality of the attending circumstances had been coerced and his will overborne so that the admission of his confession would violate his right to due process of law under the rules established by prior cases of the Supreme Court. *Crooker, Cicenia* and *Lisenba* were not in terms, or, as we see it, by implication, overruled and neither was the Supreme Court's holdings, reiterated in *Culombe* that in State court proceedings the real test of the right of the State to use a confession against an accused remains voluntariness in actuality of the confession.[1]

In the case before us there was contradiction—believable, persuasive contradiction—by the State of every significant claim of the prisoners that coercion or inducement or improper or harsh treatment had brought forth or significantly induced the confessions. There was no prolonged detention incommunicado. There was no threat, express or implied, that there would be incarceration, incommunicado or otherwise, until a confession was forthcoming. The requests of the prisoners, including those to see their respective wives, were granted. No question of the right of one charged with crime to retain and have the services of counsel of his own choosing under Article 21 of the Declaration of Rights of the Maryland Constitution has been raised and that article would not seem to have been of

---

1. Massiah v. United States, 377 U. S. 201, 12 L. Ed. 2d 246, was a federal prosecution in which a confession surreptitiously obtained through use of a listening device after indictment and after the indicted men had retained a lawyer, was held inadmissible as violative of the accused's rights under the sixth amendment to the Federal Constitution. The case does not seem apposite.

significance under the facts of the cases before us. *Audler v. Kriss,* 197 Md. 362; *Edwardsen v. State,* 220 Md. 82.

We turn to consideration of whether the holding of the Supreme Court in *Escobedo* requires rejection of the confessions of Mefford and Blackburn. In *Escobedo,* the suspect was twenty-two years old and had had no previous experience with the police. He had been questioned by the police in regard to a murder and then released. He retained and was advised by a lawyer. A few days later he was again taken into custody and questioned intensively. He repeatedly asked to see his retained lawyer and was as often refused. His lawyer, who had heard that his client had been again arrested went to the police station and made earnest, repeated and persistent efforts to see his client but was consistently rebuffed by various police officials. At one point Escobedo and his lawyer saw each other through an open door (and the lawyer made a sign which the client interpreted as not to talk), but the door was quickly shut by the police and the lawyer was ushered away.

The Supreme Court held that

"where, *as here,* the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' *Gideon v. Wainwright,* 372 U. S., at 342, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (Emphasis supplied.) (p. 4608 of 32 U. S. L. Week).

516

The Court, without doubt, limited its holding to the facts of the case. The first sentence of the opinion said so:

> "The critical question in this case is whether, *under the circumstances*, the refusal by the police to honor petitioner's request to consult with his lawyer during the course of an interrogation constitutes a denial of 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution * * *." (Emphasis added.)

The next to the last sentence of the opinion, in defining the holding of the case, precisely says:

> "We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and *under the circumstances here*, the accused must be permitted to consult with his lawyer." (Emphasis supplied.)

Further, the Court did not overrule *Crooker* and *Cicenia*. It said at p. 4608: *"Crooker v. California, 357 U. S. 433*, does not compel a contrary result," and took two long paragraphs to explain these cases and distinguish them on the facts. The opinion went no further than to say: "In any event, to the extent that *Cicenia* or *Crooker may be* inconsistent with the principles announced today, they are not to be regarded as controlling." (p. 4609) (Emphasis added.)

The facts in the cases now before us are not the facts on which the Supreme Court acted and to which it limited its holding in *Escobedo*. Mefford did not ever ask the State police, to whom he freely confessed, for a lawyer or even give a hint to them that he wanted to consult one. He was never denied the assistance of counsel. He says he volunteered to give a written statement if he saw his wife first. His statement recites that he was told of his right to remain silent and he does not claim he was not so advised. Blackburn did not ask for the assistance of counsel in connection with the questioning of the police, he asked them to charge him so he could then be provided a lawyer. Further, after he made his qualified request to Lieutenant Hanley, the lieutenant urged him to take a lie detector

test and Blackburn proposed the conditions of a bed with a mattress, twenty-four hours rest, and three good meals, and Hanley agreed, and made good. Blackburn thereafter really made no request for counsel. In addition, the testimony is explicit that Blackburn was fully and effectively advised by Hanley (as he was later by Sergeant Stacey) of his constitutional right either to talk or, without any prejudice, to remain silent (it was after this he agreed to take the lie detector test on his conditions) and, therefore, one of the essentials on which the *Escobedo* holding was based (and on which the Supreme Court distinguished *Crooker*) is lacking here because the police supplied to Blackburn the advice as to his rights to remain silent, which a lawyer would have given him, and it was after this repeated advice that he told his story, upon confrontation at his own request by his wife and by Mefford.

We think *Escobedo* does not compel a reversal in the present cases and we find no unfairness in the totality of the circumstances attendant upon the making of the confessions of Mefford or the confession of Blackburn, and are persuaded that there was no unfairness or legal or constitutional error in the admission against Mefford of his confessions or in the admission against Blackburn of his confession.

> *Judgment in the case of Frederick Morris Mefford affirmed.*
>
> *Judgment in the case of Earl LeRoy Blackburn affirmed.*

BRUNE, C. J., and PRESCOTT, J., dissent.