Frederick MEFFORD, #7574

v.

WARDEN, MARYLAND PENI-
TENTIARY.

Civ. No. 17742.

United States District Court
D. Maryland.

June 23, 1967.

John B. Powell, Baltimore, Md. (court-appointed), for petitioner.

Francis B. Burch, Atty. Gen. of Maryland, and Franklin Goldstein, Asst. Atty. Gen., Baltimore, Md., for respondent.

THOMSEN, Chief Judge.

On July 13, 1962, petitioner (Mefford) was found guilty in the Circuit Court for Harford County by Judge Day and Judge Harlan,[1] sitting without a jury, of murder in the first degree, robbery and robbery with a deadly weapon, and thereafter was sentenced to death for the murder and to imprisonment on the robbery counts. A codefendant (Blackburn) was tried separately, was convicted and received the same sentences. Their convictions were affirmed on appeal, in an opinion which discussed at length the admissibility of confessions given by the respective defendants. Mefford v. State, 235 Md. 497, 201 A.2d 824 (1964).

In a proceeding under the Maryland Post Conviction Procedure Act (PCPA),

---

1. A Judge of the Supreme Bench of Baltimore City, specially assigned.

at which Judge Menchine presided, Mefford raised again the admissibility of his confession and several other points not pressed here. Judge Menchine held a hearing and filed a written opinion denying relief, which was adopted by the Court of Appeals. Mefford v. Warden, 243 Md. 696, 221 A.2d 906 (1966).

Mefford then filed his petition for a writ of habeas corpus in this Court. At the hearing thereon, his counsel, with his approval, stated that he was pressing only the contention that Mefford's constitutional rights were violated by the admission in evidence of his confession, given to the State Police, which Mefford claims was involuntary under "the standards of voluntariness which had begun to evolve long prior to [the] decisions in *Miranda* and *Escobedo*". Davis v. State of North Carolina, 384 U.S. 737, 740, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966).

The Joint Record Extract filed in the Court of Appeals on the original appeal (which the parties agree contains all material portions of the testimony and other proceedings at Mefford's trial in Harford County), a transcript of the testimony at the PCPA hearing, and the opinions of the State Courts, were presented to this Court.

Counsel for Mefford said that he was willing to submit his case on the record as a whole. Counsel for respondent argued that the record as a whole fairly supports the factual determination of the State Courts that the confession was voluntary, 28 U.S.C.A. § 2254(d) (8), as added by PL 89–711, 80 Stat. 1105, November 2, 1966, but stated that if this Court did not agree, he wished to produce as witnesses the Baltimore County police officers mentioned in the evidence whose testimony had not theretofore been taken. At the PCPA hearing Mefford had complained because his trial counsel had not insisted that those officers be produced at the trial, when the State offered to produce them and the trial judges felt that their testimony was not necessary.[2] Mefford's trial counsel had asked that Detective White be produced and had examined him, but did not ask that the other Baltimore County officers be produced. Nor were those officers called by either side at the PCPA hearing. Because the case involves a death sentence, and because two Judges of the Court of Appeals dissented (albeit without opinion) from the affirmance of the conviction, this Court felt that all available evidence which either side might wish to present should be in the record. This Court agreed, however, to consider first whether the record as a whole fairly supports the factual determination of the State Courts. Accordingly, respondent first called the Baltimore County police officers, and Mefford then called several witnesses and testified himself. This order of procedure was preferred by Mefford and his counsel. Hatem was later called as a witness by respondent, particularly to contradict certain testimony of Mrs. Mefford.

The facts of the murder and robbery for which Mefford was convicted and the evidence other than his confession tending to prove him guilty were succinctly stated by Judge Hammond, speaking for the Court of Appeals, as follows:

"In the early morning hours of Sunday, March 4, 1962, one Snider, who was tending a gasoline service station on Route 40 at Joppa in Harford County was robbed at gun point by two men of some $103 of the station owner's money. The men left and soon after one of them returned and shot Snider in the head. He died several hours later. Not long after the shooting he said he had been held up and robbed by two men, one with reddish bushy hair and the other with

---

**2.** The testimony of the PCPA hearing shows that Hatem made careful preparation for the trial. His testimony at the PCPA hearing and in this Court shows that he was anxious to produce any evidence which he believed would tend to establish that the confession was involuntary. It has not been shown that he had any reason to believe that the testimony of those officers would help his case.

dark hair. He did not recognize the men.

"* * * The State proved at each trial that a cartridge case and a spent bullet which were found at the scene of the crime had been fired from a .32 calibre Savage pistol owned by Mefford, and by him turned over to the police, as well as that Mefford owned a 1955 red Chevrolet hardtop car with automatic transmission, and that such a car had been seen along Route 40 north of Baltimore during the late night of March 3 and the early morning of March 4, with its two male occupants surveying gasoline stations, and that within minutes of the time of the holdup the car had been observed on Route 40 heading towards Joppa." 235 Md. at 501–502, 201 A. 2d at 825.

The Court of Appeals held that "the confessions of Mefford (which we find to have been properly admitted), considered with the proof of the corpus delicti and the facts that Mefford's pistol was used to shoot Snider, his motive for the shooting (feared recognition by Snider) and the presence of a car like Mefford's near the scene at the time of the shooting, certainly properly permitted the triers of fact to have been persuaded, as they were, beyond a reasonable doubt, that Mefford was one of the two guilty men." 235 Md. at 504, 201 A.2d at 826.

The Court of Appeals noted: "It was brought out also in each trial that on April 16, 1962, a filling station on Route 40 at Chesaco, in Baltimore County, had been robbed by men who used the techniques used by the robbers at the station at Route 40 and Joppa. The State police who were investigating the Joppa case and the Baltimore County police assigned to the Chesaco case began to cooperate in an effort to solve both crimes, believing them to have been committed by the same individuals." 235 Md. at 502, 201 A.2d at 825.

The testimony at the hearing in this Court showed that some time before February 17, 1961, there had also been a robbery in Baltimore County at Van's Shell Service Station on Route 40 at Middle River Road, while Mefford was an employee of that station; that another employee had been "roughed up" by the robbers, but Mefford had not; and that Mefford had been suspected of complicity in that robbery and had been held and questioned by the Baltimore County Police for about 72 hours beginning on February 17, 1961. The evidence here further showed that Mefford had been advised by his brother-in-law, an experienced criminal, that he had a right to a lawyer, and that he was not required to say anything.

The Court of Appeals noted that "Mefford's claim on the inadmissibility of his confessions is that he was illegally arrested and illegally detained and was denied the right to call his family or a lawyer." 235 Md. at 504, 201 A.2d at 826. The Court of Appeals stated the trial evidence on that point as follows:

"* * * He was arrested about ten-thirty in the morning on April 20 by the Baltimore County police who wanted to question him about the robbery at Route 40 at Chesaco and, incidentally, about the case at Route 40 and Joppa. He was interrogated during the day and then placed in a cell in which there was a metal bunk and toilet facilities. The next day, Saturday, he was again questioned, and at about 4:30 was taken to the Essex police station, which was better equipped for overnight prisoners, for the weekend. He was not questioned Saturday night, Sunday (which was Easter), or Sunday night but, he says, permitted to sleep when he wanted to, without interruption. He was fed regularly although he says the meals were not good, particularly one consisting of a cold hamburger and a cup of cold coffee. He says he asked on numerous occasions for a chance to call his family and a lawyer, but was refused. He says also that he was told he would be held seventy-two hours and then released, but picked up again and held for a similar period, and so

on, until he confessed. He does not claim he was otherwise in any way coerced or that he was physically manhandled and says the County police did not break him down. Indeed, he does not claim (and there is no testimony that it was a fact) that the County police questioned him about the crime the State police were investigating. On Monday morning he was brought back to Towson and, after being questioned for a short time, was given back his belongings, including a knife, and released. He was arrested outside the Towson police headquarters by Corporal Seekford, of the State police, who was in charge of the investigation of the Joppa case, and who had been told by the County police that they had in custody a 'particular suspect' in the Joppa case whom they were going to release. Mefford's wife had called the County police during the weekend and had been told she could see her husband Monday at Towson. When she arrived Mefford had been released but he left with the police his endorsed paycheck —which she was seeking—and the police gave it to her. His reason for leaving the check, he told the police, was that he was not going home and he was not afraid to leave the endorsed check with the police because, he said, '[i]f you can't trust the police, who can you trust?'

"Corporal Seekford took Mefford to Benson Barracks near Bel Air where, Mefford says he was given the first 'decent' meal he had had since his arrest. After lunch Seekford took Mefford to the North East Barracks where Sergeant Stacey, the polygraph expert, had his headquarters and his apparatus. Stacey talked to him for an hour or so, and then he was given supper. After supper Stacey again questioned Mefford for an hour and a half. The officers testified that Mefford at that point volunteered that he would clear up the Route 40 cases if he could see his wife and arrange for the sale of his car so she would have some money.

This suggestion came from him, not from the police. As a result of the questioning at North East Barracks, Corporal Seekford took Mefford on a trip in a police car. They left about ten that night (Monday, April 23) and, driving slowly, with a stop for a soft drink, arrived at Mefford's home in Armistead Gardens near Baltimore about an hour later. On the way Mefford says he gave Seekford the knife he had (with which, he said, he could have 'inflicted' the officer, the State police not, apparently, having searched him). Mefford greeted his wife and child and then got from her the keys to a 1950 Plymouth car, which was in their garage. A search of the trunk of the Plymouth for the murder weapon, which Mefford expected to be there, produced nothing. Seekford next drove Mefford past 723 Luzerne Avenue in Baltimore, where Blackburn lived, and then out Route 40 to Chesaco, where Mefford made several telephone calls, including one to his brother-in-law, Irvin Ellis, who lived near Reisterstown. Accompanied by Detective White, of the County police, who had joined them at Chesaco, they drove to Ellis' place where, at Mefford's request, Ellis gave Seekford a white bag in which were a .32 calibre Savage pistol—the murder weapon— and a sawed off shot gun (Ellis had taken them from the Plymouth to protect Mefford when he learned he was in police custody). Seekford took Mefford to Towson where he was incarcerated until morning and then returned him to the North East Barracks. (Seekford and other police officers went in the early morning hours to arrest Blackburn at Luzerne Avenue, after Mefford had been taken to Towson.)

"On the trip during the night of the 23rd, Mefford at various times gave a full account of the robbery and murder and of the participation in it of Blackburn and himself, attributing the shooting of Snider with his (Mefford's) gun to Blackburn. In the

morning of April 24, he repeated the confessions to a police stenographer in the form of answers to questions asked by a police officer. The stenographer transcribed the statement but Mefford would not sign it until he saw his wife, as the police had told him the day before he could, and told her about the case and the circumstances, first hand. Mrs. Mefford was brought to the Barracks about eleven o'clock on Tuesday, April 24, and she and Mefford talked for fifteen minutes. She went home and he signed the confession.

"The witnesses were sequestered at both trials. Each of the police officers who had any part in the confessions of Mefford, or contact with him in connection therewith, testified in detail that no threats were made or coercion applied and no inducements offered or promises made to procure any part or the whole of any confession. The Baltimore County police did not testify. After Corporal Seekford, in his testimony as to the events leading up to Mefford's oral confession, mentioned that he had been in custody of the County police for three days, Mefford's counsel suggested that the State had the burden of producing the County police as part of a showing of voluntariness. The State offered to do so, but the court said it did not think it necessary at that point, and Mefford's counsel seemingly acquiesced. After Mefford had testified, the State again offered to produce the County policemen if the court thought it necessary. The court said that Mefford's testimony, assuming it to be true, showed that the treatment he received from the County police did not at the time cause him to break down and had not influenced his subsequent confessions, and admitted both into evidence. Mefford's counsel then again seemingly acquiesced.

"Mefford, in testifying on voluntariness of his confessions, reiterated from the stand that all he had said in them was true. He said he thought the State and County police would 'bounce' him back and forth between them if he did not confess, although he admits the State police did and said nothing to make him think this. He did not ask the State police for a lawyer at any time, or suggest that he wanted one, because the County police had refused, he said, to let him call one. He admits that the State police treated him very well and, in addition to his testimony from the stand to that effect, in his written confession in answer to 'how have you been treated since you have been in the custody of the Maryland State police,' he replied: 'That's a good question. How do you put that. Fair. Good, I guess. Couldn't say excellent. Could say like a gentleman, but that's not my language.'

"He told the court that the police did not make his confession a condition precedent to his seeing his wife, but that the offer was his. When asked by the court if he had volunteered to give the written statement if he saw his wife, he agreed he had, saying '[u]nder the situation and the strain I was in I had no other choice.' Immediately thereafter he confirmed to the court that he had been well treated by Seekford and Stacey, the only State policemen with whom he had been in contact, and could not be specific about his 'situation' and the 'strain' which left him no choice." 235 Md. at 504–507, 201 A.2d at 826–828.

The Court of Appeals concluded:

"We think the trial judges had full reason to conclude, as they did, that Mefford's confessions were the voluntary products of a free and unconstrained will, which, as a matter of fact, had not been overborne or compelled." 235 Md. at 507–508, 201 A.2d at 828.

The discussion of the law by the Court of Appeals and its final conclusion are treated below. At this point, it is sufficient to note that in the course of its discussion of the law the Court of Ap-

peals stated: "The finding of the trial court that the County police confinement did not break down Mefford's will or induce his later confession is supported by the testimony in the case. There was a significant break in the confinement complained of, and in his attitude towards it, for, as he himself frankly said, he was well treated by the State police and had no reason ever to believe while in their custody that such treatment would not continue whether or not he confessed." 235 Md. at 512, 201 A.2d at 831.

This Court finds and holds that the evidence in the record was fairly stated in the opinion of the Court of Appeals, and this Court agrees with their finding that "the trial judges had full reason to conclude, as they did, that Mefford's confessions were the voluntary products of a free and unconstrained will, which, as a matter of fact, had not been overborne or compelled." 235 Md. at 507–508, 201 A.2d at 828. This Court might accept that finding, 28 U.S.C.A. § 2254(d), as added by PL 89–711, 80 Stat. 1105, November 2, 1966, but since it depends on the credibility of the witnesses, this Court has concluded that it should make its own determination based upon all the evidence, including that taken in open court herein, at the criminal trial and at the PCPA hearing.

Mefford testified at the PCPA hearing as well as in this Court. Although he stopped school after the sixth grade, he served in the Army and received a "high school equivalence" certificate. He has worked for some years off and on in a printing shop, and testified that he "proofread" the statement which he gave to the State Police after it had been typed. His testimony and his bearing on the stand convince this Court that he is a shrewd, cold man, who is willing to say anything that he thinks will help him. For example, he testified in the PCPA proceeding that the only conference he had with his trial counsel (Hatem) before the trial lasted three or four minutes. That was contradicted by Hatem, who testified that his first conference with Mefford was brief, but thereafter they had had protracted conferences, at which plans for the trial were discussed. Mefford's wife, now divorced, his brother and his brother-in-law, quite naturally, appeared anxious to say what they could to help him. Mrs. Mefford testified here that Hatem would not permit her to testify at the trial about certain statements she now says were made to her by the police. Hatem denies that he so instructed her, and her testimony is incredible, in view of what Hatem was trying to prove.

The four Baltimore County police officers who testified varied in the clarity of their recollection of what happened five years ago. This Court is satisfied, however, that the officers were telling the truth when they testified in this Court that they did not tell Mefford or his wife or anyone else that he would be held 72 hours and then released, but picked up again and held for a similar period, and so on until he confessed. This Court finds that Mefford believed that he could not be held for more than 72 hours; that he was willing to "sit it out" for that period and told the officers so; that although he was not told that he might have a lawyer present and need not answer any questions, he knew that he had a right to a lawyer and that he need not say anything; that he did not ask for a lawyer nor ask to make a telephone call to anyone; and that he did not break down or tell the Baltimore County officers anything important. The Court further finds that the officers did not make the extravagant threats to which Mefford testified.

The Baltimore County Police were interested in the Baltimore County robberies, the last of which, on April 16, 1962, had resulted in a murder, and were not charged with responsibility for investigating the Harford County robbery and murder on March 4, 1962. That was the responsibility of the State Police. When they learned that Mefford was in the custody of the Baltimore County Police, they arranged to have Corporal Seekford of the State Police go to Tow-

son to pick Mefford up as soon as he left the Baltimore County Police Station. The facts with respect to the custody by the State Police and the statements made to them are set out in the long quotation from the opinion of the Court of Appeals, above. The testimony at the PCPA hearing and in this Court gives added support to the conclusion that Mefford's confessions to the State Police were voluntary. Mefford had been contemptuous of the Baltimore County Police and did not believe that they could prove him guilty of the Baltimore County crimes; but he knew that the State Police had some evidence tending to prove his connection with the Harford County (Joppa Road) crime; he did not know how much they had or how far he could trust Blackburn, and he believed he could prove that Blackburn had done the actual shooting on that occasion.

## The Law

The Court of Appeals held that Mefford's arrest, on the record, was illegal. This Court agrees. The Court of

Appeals then considered Mefford's contention that his confession was involuntary as a matter of law, and inadmissible, simply because it was given while he was in custody after an illegal arrest, under the doctrine of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Court of Appeals said: "The contention will not presently aid Mefford, for this Court has held that *Wong Sun* was not intended to, and does not, control prosecutions in State courts and that the rule of the Supreme Court in such cases (Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037) and that of Maryland remains that the critical test of admissibility of a confession is whether, under all circumstances, it was, in actuality, voluntary." 235 Md. at 511, 201 A.2d at 831.[3] The Court continued:

"We think the circumstances attending the confessions of Mefford and Blackburn do not require a reversal of the trial judges' findings that they were voluntary. Mefford had been in

---

3. This question was left open in Clewis v. State of Texas, 386 U.S. 707, 711, n. 7, 87 S.Ct. 1338, 1341, n. 7, 18 L.Ed.2d 423. See also Ralph v. Pepersack, 335 F.2d 128, 136, n. 11 (4 Cir., 1964). Even if *Wong Sun* is applicable, it does not mean that the confession given by Mefford to the State Police was inadmissible simply because he had been illegally arrested by the County Police. In United States v. Close, 349 F.2d 841, 851 (4 Cir., 1965), Judge Boreman, speaking for the Court said:

"It is true, as appellant contends, that the Supreme Court held in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), that oral statements of an accused may be so inextricably and intimately bound up with the conditions and circumstances of an *illegal* arrest as to become tainted and inadmissible under the exclusionary rule of Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, supplemented by Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319. It is argued that the statements made by Harold while under arrest on the vagrancy charge are tainted by the arrest and thus inadmissible in evidence against him. However, this argument is again incorrectly premised upon

an arrest claimed to be *illegal*. Assuming, arguendo, that the initial arrest by the Roanoke police was illegal, we construe Wong Sun as holding, in effect, that not all oral statements are the fruit of the 'poisonous tree' simply because they would not have been made but for the illegal actions of the police. We think the Court in Wong Sun, clearly indicates the view that a statement which is shown to have been freely and voluntarily made without coercion, either physical or psychological, may be thereby purged of any stigma of illegality and the statement is admissible. As we read the decisions of certain other courts, we conclude that they have so interpreted the Court's indicated view in Wong Sun. See: Rogers v. United States, 330 F.2d 535 (5 Cir. 1964); Burke v. United States, 328 F.2d 399 (1 Cir. 1964); Hollingsworth v. United States, 321 F.2d 342 (10 Cir. 1963). There is abundant evidence to support the Government's contention that all statements made by Harold during any and all of his conversations with the police and the F.B.I. agents were voluntarily given, free of coercion, and with full knowledge of his rights. Thus we find no error in permitting evidence of these statements to be presented to the jury."

custody some four days when he first confessed, but had been allowed complete rest from Saturday night to Monday morning, when he was again arrested after his release by the County police. The finding of the trial court that the County police confinement did not break down Mefford's will or induce his later confession is supported by the testimony in the case. There was a significant break in the confinement complained of, and in his attitude towards it, for, as he himself frankly said, he was well treated by the State police and had no reason ever to believe while in their custody that such treatment would not continue whether or not he confessed. What we said in O'Connor v. State, 234 Md. 459, 461, 199 A.2d 807, 808, where the prisoner was taken from the custody of the New Jersey police by Maryland officers and confessed to the latter, and the defense was that the confession was involuntary because of mistreatment in New Jersey, is apposite here: 'Any connection between the alleged mistreatment by the New Jersey police and his statements to the Maryland police was effectively broken, as the trial court found'." 235 Md. at 512, 201 A.2d at 831.

■ The relationship between the Baltimore County Police and the State Police was no doubt closer than the relationship between the New Jersey Police and the Maryland Police in the O'Connor case. This Court is of the opinion that what transpired in Baltimore County is a part of the totality of the circumstances which must be considered in this case, but this Court does not find that there was any such mistreatment in Baltimore County as would itself make the later confession to the State Police involuntary.[4] The Court of Appeals stated, and the additional evidence taken here strengthens their statement:

"There was no unduly long questioning, no persistent hammering by relays of officers, no physical mistreatment, no deprivation of rest or food in either Mefford's or Blackburn's case. Neither was held incommunicado. Mefford was taken to see his wife the night of the day the State police arrested him, and she was brought to see him the next morning. * * * The transfers of the prisoners from station to station were all made for legitimate purposes. The failure to have preliminary hearings is not of material significance on the matter of the voluntariness of the confessions. O'Connor v. State, supra; Shorey v. State, 227 Md. 385, 177 A.2d 245; Hardesty v. State, 223 Md. 559, 165 A.2d 761.

"The remaining question arises from the complaint of Mefford and Blackburn, each that he was denied counsel and that this made his confession involuntary. Mefford freely concedes that he made no request for counsel while he was in the custody of the State police. * * * Neither claims that ever was he told or led to believe he could have a lawyer only after he confessed." 235 Md. at 512–513, 201 A.2d at 831.

---

4. In Westover v. United States, consolidated on appeal with Miranda v. Arizona, 384 U.S. 436, at 496–497, 86 S.Ct. 1602, at 1639, 16 L.Ed.2d 694, the Supreme Court said:
"We do not suggest that law enforcement authorities are precluded from questioning any individual who has been held for a period of time by other authorities and interrogated by them without appropriate warnings. A different case would be presented if an accused were taken into custody by the second authority, removed both in time and place from his original surroundings, and then adequately advised of his rights and given an opportunity to exercise them. But here the FBI interrogation was conducted immediately following the state interrogation in the same police station—in the same compelling surroundings. Thus, in obtaining a confession from Westover the federal authorities were the beneficiaries of the pressure applied by the local in-custody interrogation. In these circumstances the giving of warnings alone was not sufficient to protect the privilege."

█ The Court of Appeals considered at length the then recent decisions in Haynes v. State of Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and concluded that "in State court proceedings the real test of the right of the State to use a confession against an accused remains voluntariness in actuality of the confession". 235 Md. at 514, 201 A.2d at 832. The decisions in Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), and in Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), support the conclusion that the decisions in *Escobedo* and *Miranda* do not apply to trials held before those decisions. The Court of Appeals also said:

"In the case before us there was contradiction—believable, persuasive contradiction—by the State of every significant claim of the prisoners that coercion or inducement or improper or harsh treatment had brought forth or significantly induced the confessions. There was no prolonged detention incommunicado. There was no threat, express or implied, that there would be incarceration, incommunicado or otherwise, until a confession was forthcoming. The requests of the prisoners, including those to see their respective wives, were granted. No question of the right of one charged with crime to retain and have the services of counsel of his own choosing under Article 21 of the Declaration of Rights of the Maryland Constitution has been raised and that article would not seem to have been of significance under the facts of the cases before us. (citations omitted)." 235 Md. at 514–515, 201 A.2d at 832.

The Court of Appeals noted that "Mefford did not ever ask the State police, to whom he freely confessed, for a lawyer or even give a hint to them that he wanted to consult one. He was never denied the assistance of counsel. He says he volunteered to give a written statement if he saw his wife first. His statement recites that he was told of his right to remain silent and he does not claim he was not so advised." 235 Md. at 516, 201 A.2d at 833–834. Mefford testified here that he was not so advised, but the testimony of his brother-in-law and his own conduct show clearly that he was aware of that right. The Court of Appeals concluded:

"We think *Escobedo* does not compel a reversal in the present cases and we find no unfairness in the totality of the circumstances attendant upon the making of the confessions of Mefford or the confession of Blackburn, and are persuaded that there was no unfairness or legal or constitutional error in the admission against Mefford of his confessions or in the admission against Blackburn of his confession." 235 Md. at 517, 201 A.2d at 834.

The record of the trial, the record of the PCPA proceeding and the testimony presented at the hearing herein, prove that Mefford's confessions were voluntary. Applying to the evidence "the standards of voluntariness which had begun to evolve long prior to [the] decisions in *Miranda* and *Escobedo*", and which are applicable in this case, this Court concludes that the admission of the confessions in evidence against Mefford did not deprive him of any constitutional right. In reaching that conclusion, this Court has been aware of the burden of proof on the State at the trial, see Smith v. State, 189 Md. 596, 56 A.2d 818 (1947), cited by Mefford's attorney, and Stevenson v. Boles, 331 F.2d 939 (4 Cir., 1964), aff'd per curiam, 379 U.S. 43, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964).

The relief prayed is hereby denied and Mefford is remanded to the custody of respondent.