Earl Leroy BLACKBURN

v.

Roger B. COPINGER, Warden, Maryland
State Penitentiary.

Civ. No. 19688.

United States District Court
D. Maryland.

June 11, 1969.

E. Clinton Bamberger, Jr., Larry P.
Scriggins, and George A. Nilson, Balti-
more, Md., for plaintiff.

Francis B. Burch, Atty. Gen., of Mary-
land, and Alfred J. O'Ferrall, III, Asst.
Atty. Gen., of Maryland, for defendant.

**FRANK A. KAUFMAN, District Judge:**

Earl Leroy Blackburn is a state prisoner in the Maryland Penitentiary confined under a sentence of death. Blackburn seeks in this case a writ of habeas corpus on the ground that the only incriminating evidence introduced against him at his trial was his own confession and that that confession was involuntarily given. Blackburn contends that his confession was the product of an overborne will, obtained in violation of his right to counsel, in violation of his right to be advised of his constitutional rights, under coercive circumstances, and during a period when he was illegally denied due process of law.

Blackburn was tried under an indictment containing four counts: murder in the perpetration of a robbery (murder in the first degree); stealing $130 more or less (robbery); robbery with a deadly weapon of $130, more or less (armed robbery); and assault. In the early morning hours of Sunday, March 4, 1962, an attendant was killed during the course of a robbery of a gasoline station on Route 40 at Joppa Road in Harford County, Maryland. The victim, Willis Snider, was robbed at gun point of approximately $130 of the station owner's money. One of the felons thereafter shot Snider in the head. Somehow, Snider was able to make his way to a nearby restaurant, where he told an employee that he had been robbed and shot. According to the employee, Snider stated that he could identify the felons if he saw them again but could not give their names; the only description that Snider was able to give was that one man had black hair and the other reddish bushy hair. Snider died in a hospital several hours later after emergency treatment failed to save his life.

The robbery at Route 40 at Joppa Road was similar to one other robbery-murder and several other robberies of service stations which had been committed in Baltimore County during the previous year. The Baltimore County Police had suspected one Frederick Mefford of participation in those other robberies and had questioned him about them in February, 1961. After yet another robbery-murder in Baltimore County at Route 40 at Chesaco on April 16, 1962, only a month after the Joppa robbery, the Baltimore County Police arrested Mefford, without a warrant, and held him for interrogation. This was during the morning of April 20. Mefford was released three days later, but the State Police, having learned that he was in custody, immediately arrested him (again without a warrant) and took him to Benson Barracks located in Harford County, Maryland. After interrogation that day (April 23), Mefford volunteered to clear up the Route 40 cases. He said that he and Blackburn had participated in the March 4th robbery and he claimed that Blackburn shot Snider with his (Mefford's) gun. This gun was found, with Mefford's help, at the home of Mefford's brother-in-law, Irvin Ellis.[1]

On the basis of Mefford's statements, Corporal Seekford, Detective White and two other State Police officers arrested Blackburn at about 3:00 a. m. on Monday, April 24, 1962. For the next two days—for over 40 consecutive hours—Blackburn was held without formal charge and interrogated by groups of state and county police officers until he confessed on the night of April 25. Blackburn was then 29 years old and was holding a steady job as a barber in Annapolis. He had previously served time in prison and was on probation when those events occurred in 1962.

At Mefford's trial in the Circuit Court for Harford County before Judges Day and Harlan, sitting without a jury, it was established[2] that Mefford's gun was

---

1. The events of Mefford's arrests and interrogations, which are sketched in this opinion as a matter of background, are set forth in detail in Mefford and Blackburn v. State, 235 Md. 497, 504–508, 201

A.2d 824 (1964), and Mefford v. Warden, 270 F.Supp. 745, 747–751 (D.Md.1967).

2. See Mefford and Blackburn v. State, supra, 235 Md. at 501–502, 504, 201 A.2d

the murder weapon and that a car fitting the description of Mefford's (a 1955 red Chevrolet hardtop with automatic transmission) had been observed "casing" several service stations along Route 40 during the late night of March 3 and early morning of March 4. In addition, a possible motive for the murder of Snider was shown: Mefford had worked with Snider once or twice in Route 40 service stations and may have feared recognition if he had left the robbery victim alive. Mefford's confession was admitted into evidence during his trial. On July 13, 1962, Mefford was found guilty and sentenced to death for murder and to imprisonment for robbery and robbery with a deadly weapon.[3]

Blackburn's trial commenced on July 24, 1962 in the Circuit Court for Harford County, also before Judges Day and Harlan sitting without a jury. The State introduced all of the evidence, except Mefford's confession, which it had produced during Mefford's trial, in order to show the corpus delicti. However, none of this evidence—i. e., Mefford's gun (the murder weapon), the *observations of a car similar to Mefford's*, and Mefford's motive for wanting Snider killed—implicated Blackburn. Indeed, there was no extrinsic evidence whatsoever which linked Blackburn to

the crime. Fingerprints and footprints had been lifted from the scene of the crime, but none of them matched Blackburn's.[4] Snider's dying description of the felons was not very specific and did not fit Blackburn.[5] The *only* incriminating evidence produced by the State at the trial against Blackburn was his own confession. Blackburn's court-appointed counsel objected vigorously to the admission of the confession on the ground that it had been given involuntarily and therefore could not be constitutionally admitted. Over half of the five days of Blackburn's trial was devoted to taking evidence bearing upon the voluntariness of Blackburn's confession. After that hearing, Judges Day and Harlan ruled that the confession was admissible and later denied the defense motion to strike it from evidence.[6] Blackburn took the stand in his own defense, contending that his confession was not voluntarily given and asserting his innocence. At the close of the trial, Judges Day and Harlan found Blackburn guilty of murder in the first degree, robbery and robbery with a deadly weapon, but acquitted him on the assault charge. The guilty verdict in the murder case was premised on the felony-murder rule, which holds each participant in a robbery equally liable for any resulting death regardless of who fired the fatal shot.[7] Blackburn was sen-

---

824; Mefford v. Warden, *supra* at 747 of 270 F.Supp.

3. Mefford's conviction was affirmed on appeal by the Maryland Court of Appeals. Mefford and Blackburn v. State, *supra*. Mefford then petitioned for collateral review in the state courts under the Maryland Post Conviction Procedure Act. Judge Menchine, after holding a hearing, denied relief. In re Mefford, Mem. No. 947/3/96 (Cir.Ct. Harford County 1966). The Maryland Court of Appeals denied Mefford's application for leave to appeal from Judge Menchine's order. Mefford v. Warden of Maryland Penitentiary, 243 Md. 696, 221 A.2d 906 (1966). Mefford next petitioned this Court for federal habeas corpus relief, which was denied by Chief Judge Thomsen, after an evidentiary hearing. Mefford v. Warden, *supra*, 270 F.Supp. 745 (D.Md.1967). From that denial by Chief

Judge Thomsen, Mefford noted an appeal to the United States Court of Appeals for the Fourth Circuit, which is currently pending therein.

4. E. 251–52. (References cited as "E." are to the Joint Record Extract of Blackburn's trial, which is part of the record in this proceeding.)

5. Snider said that one of the felons had black hair and the other reddish bushy hair. E. 45–48. Blackburn has brown hair. E. 443, 268. One officer who arrested Blackburn described it as "dark" and "bushy" at the time of the arrest. E. 169. At another point, that same officer (Corporal Seckford) said Blackburn's hair was brown when he took Blackburn into custody during the early A.M. hours of April 24, 1962. E. 213.

6. E. 435–36, 456.

7. E. 454.

tenced to death for murder and to imprisonment for concurrent terms of ten and twenty years for robbery and robbery with a deadly weapon, respectively.

Blackburn's conviction was affirmed by a divided Maryland Court of Appeals, 3–2, which filed a joint opinion in connection with the appeals of Mefford and Blackburn. Mefford and Blackburn v. State, 235 Md. 497, 201 A.2d 824 (1964). Judge Hammond wrote the majority opinion; Chief Judge Brune and Judge Prescott dissented, without opinion, with regard to the appeals of both Mefford and Blackburn. Blackburn's petition for writ of certiorari was denied by the Supreme Court, Mr. Justice Douglas dissenting. Blackburn v. Maryland, 380 U.S. 937, 85 S.Ct. 944, 13 L.Ed.2d 825 (1965). Blackburn, seeking federal habeas corpus relief in this Court, contends, as he did in all his prior litigation, that his conviction cannot stand because the confession used against him at trial was unconstitutionally obtained.

### I.

A. In its answer to this Court's order to show cause, respondent originally averred that petitioner has not exhausted his available state remedies as required by Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), and 28 U.S.C.A. § 2254. Even though the same contentions advanced by Blackburn herein were decided on the merits adversely by the highest court of Maryland, respondent originally urged that the state courts should be given an opportunity to consider the impact of cases dealing with the test of voluntariness which have been decided by the Supreme Court and by the United States Court of Appeals for the Fourth Circuit since the Maryland Court of Appeals affirmed Blackburn's conviction.[8] However, in a supplemental answer, respondent not only abandoned

the claim of nonexhaustion of state remedies but affirmatively asked this Court to entertain the within petition on the merits.

■ This Court agrees that petitioner has exhausted his state remedies. The exhaustion requirement is not a jurisdictional limitation upon a federal court; rather, it is a rule which has been developed in the interest of comity between the federal and state judicial systems. Fay v. Noia, 372 U.S. 391, 418–420, 430–431, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Hunt v. Warden, 335 F.2d 936, 940 (4th Cir. 1964). When a question has been presented to and adjudicated by the state's highest court once, there is no need to urge it upon the state courts yet a second time under an alternate procedure. Hamric v. Bailey, 386 F.2d 390 (4th Cir. 1967); Grundler v. North Carolina, 283 F.2d 798 (4th Cir.), cert. denied, 362 U.S. 917, 80 S.Ct. 670, 4 L. Ed.2d 738 (1960). While there may well be reason to graft an exception when there has been an intervening change of law declared by the Supreme Court, this is not such a case. Since Blackburn's trial was held prior to the Supreme Court's decisions in *Miranda* and *Escobedo*, the proper test of the admissibility of the confession was whether it was given voluntarily under the "totality of the circumstances." Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). This is precisely the test employed by the Maryland Court of Appeals in rejecting Blackburn's appeal; if anything, the voluntariness test used in adjudicating petitioner's direct appeal was more stringent than the Supreme Court has established inasmuch as the Court of Appeals apparently believed that *Escobedo* had retroac-

---

8. Respondent cited the following cases as examples: Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); Johnson v. New Jersey, 384 U.S. 719, 86

S.Ct. 1772, 16 L.Ed.2d 882 (1966); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Ledbetter v. Warden, 368 F.2d 490 (4th Cir. 1966); and Smallwood v. Warden, 367 F.2d 945 (4th Cir. 1966).

tive effect but felt that it was distinguishable and therefore not controlling. See Mefford and Blackburn v. State, *supra* at 513–517 of 235 Md., 201 A.2d 824. The Court of Appeals concluded:

> We think *Escobedo* does not compel a reversal in the present case and we find no unfairness in the totality of the circumstances attendant upon the making of the \* \* \* confession of Blackburn, and are persuaded that there was no unfairness or legal or constitutional error \* \* \* in the admission against Blackburn of his confession. [*Id.* at 517, 201 A.2d at 834].

■ Moreover, the analysis used by the Court of Appeals in *Mefford and Blackburn* in applying the "totality of the circumstances" standard has not since changed. On the contrary, the opinion in *Mefford and Blackburn* has been relied on by the Court of Appeals, as for instance, in Cunningham v. State, 247 Md. 404, 418–419, 231 A.2d 501 (1967), and Cowans v. State, 238 Md. 433, 437, 209 A.2d 552 (1965), and by the Court of Special Appeals, as in Robinson v. State, 3 Md.App. 666, 672, 240 A.2d 638 (1968). Finally, when Mefford petitioned for post-conviction relief in the state court, his contentions regarding the inadmissibility of his confessions were deemed improperly raised in the collateral proceeding since they had been held without merit in his direct appeal. In re Mefford, Mem. No. 947/3/96 (Cir. Ct. Harford County 1966), application for leave to appeal denied, 243 Md. 696, 221 A.2d 906 (1966). Respondent, through its counsel, the Attorney General of Maryland, represented in its supplemental answer that: "It is your Respondent's firm belief that even in light of the subsequent [federal] decisions the Maryland Court's post conviction review would treat the Petitioner as it did his co-defendant Mefford." Given all these factors, comity would not be served by requiring Blackburn to return to the Maryland courts.

B. The Joint Record Extract filed in the Court of Appeals in Blackburn's original appeal has been made part of the record in this proceeding. Petitioner and respondent agree that that extract contains all of the testimony and evidence presented at Blackburn's trial relevant to the single issue, i. e., voluntariness, presented herein. Mindful (a) of the desirability, and in some instances, the requirement that evidence be taken in this Court in a habeas corpus proceeding when all material facts may not have been adequately developed, Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), (b) the fact that petitioner was sentenced to death, (c) the 3–2 division in the Court of Appeals of Maryland, and (d) the fact that testimony was taken before Chief Judge Thomsen of this Court in Mefford v. Warden, *supra* 270 F.Supp. at 746, this Court offered to each side the opportunity to present additional evidence. However, counsel for both petitioner and respondent firmly expressed the view that the present record of the case is fully adequate for a legal determination of the constitutional issue and declined the opportunity to produce any evidence in this Court.

■ At petitioner's trial, which was held but a few months after his arrest and interrogation, both counsel for petitioner and for the State did outstanding jobs in eliciting in minute detail the events surrounding petitioner's in-custody detention which led to his confession. It is now almost seven years later; memories obviously must have faded to some extent. To attempt to secure an accurate reconstruction of the scene at this late date could well be counter-productive. This Court therefore agrees with counsel for both parties that it should make its determination on the record before it.[9] In this regard,

---

9. Because of the length and complexity of the record, and because the testimony at the trial was not given in the chronological order of the events of petitioner's de-

tention, this Court, before counsel finally determined that none of them desired to produce evidence in this Court, prepared a twenty-one page summary of the tes-

it is relevant to note that, while Blackburn has continuously asserted his innocence, this Court is not called upon to decide, and does not herein decide, the guilt or innocence of petitioner. The only question before this Court—indeed, the only question which this Court has power to decide—is whether Blackburn is being held in custody under a sentence resulting from a conviction at a trial in which the sole evidence linking him with the crime was an involuntary confession. The trustworthiness of an involuntary confession is of course highly suspect. But even if the truthfulness of an involuntary confession is shown, a conviction based on it cannot stand if "the methods used to extract [the confession] offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." Rogers v. Richmond, 365 U.S. 534, 541, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). Thus, the issue before this Court is whether Blackburn's confession was voluntarily or involuntarily given—not whether or not Blackburn in fact committed the crimes to which he confessed.[10]

## II.

Blackburn's arrest occurred at about 3:00 a. m. in the morning of Monday, April 24, 1962. Awakened by a pounding at his front door and dressed in a T-shirt, pants and slippers, he went outside where he was confronted by Corporal Seekford, Detective White and two other officers. They handcuffed his hands behind his back and took him into custody. Blackburn claimed at trial that the handcuffing was very painful because he has a deformed left hand which he cannot straighten. Corporal Seekford admitted at trial that Blackburn told him of the injury at the time of Blackburn's initial detention and that his "arms wouldn't come together in the rear very easily" but denied that Blackburn complained of any pain.[11] Blackburn also testified that the officers did not tell him the reason for the arrest and that they refused to let him get more clothes, his glasses, and a brace that he wears on his back.[12] On the other hand, Corporal Seekford testified that he told Blackburn that he was being taken into custody for the Joppa Road robbery-murder, and both Corporal Seekford and Detective White denied that Blackburn asked for more clothing, glasses or a brace.[13]

The police took Blackburn to Towson Headquarters in Baltimore County where they arrived at a little after 4:00 a. m. The details of what happened there, even the chronology of events, were the subject of dispute at trial between Blackburn and the state witnesses, and there are even contradictions among the latter. The important points which are not disputed are as follows: Sometime in the early morning of April 24, Blackburn was interrogated for at least an hour by Lieutenant Kaminsky, Corporal

timony both in chronological order and by each of the prosecution and defense witnesses. Counsel for petitioner and respondent examined this summary and stipulated that, with the exception of a few minor errors (which were noted and corrected), it fairly summarized the material features of the testimony. Counsel submitted this summary as part of the record and indicated on it: (a) those historical facts set forth in the testimony which are disputed, and those which are undisputed; (b) those facts associated with the subjective reactions of petitioner which must be weighed in the totality of the circum-

stances; and (c) the status of various factors to be considered in assessing voluntariness which are also to be weighed in the totality of the circumstances (e.g., advice of rights, requests to be booked and given a lawyer and techniques of the police interrogation).

10. *Cf.* Kaufman v. United States, 394 U.S. 217, 229, 234–237, 242, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969).

11. E. 199, 228, 231.

12. E. 370, 334.

13. E. 168, 223–24, 413.

Seekford and Detective White.[14] Although Lieutenant Kaminsky told Blackburn that he was being held as a suspect in the Joppa Road robbery-murder, Blackburn was not warned by any of the officers that anything he said could be used against him; neither was he advised of his right to remain silent, nor of his right to counsel, nor of his right to a preliminary hearing. This is uncontradicted. Also undisputed is that Blackburn stated during the questioning that if the police had anything on him, they should book him and charge him, and let him get a lawyer. This was testified to by both Corporal Seekford and Blackburn.[15] Blackburn was not booked and his request that he be booked, charged and permitted counsel was ignored. The questioning continued, Blackburn was shown Mefford's pistol and shotgun, and Corporal Seekford repeated the details of the crime several times.[16] After the interrogation was completed, Blackburn was taken to a detention cell, which consisted of cement walls and floors, an all-steel bunk, and a solid metal door with a small opening.[17] Thereafter, he was taken to the "ident room" for photographing and fingerprinting.[18] The fingerprinting was painful because of the condition of Blackburn's left hand.[19] Then Blackburn was returned to the detention cell where he remained for three to four hours.[20]

Blackburn's treatment in the detention cell, interrogation room and "ident room" is sharply disputed. Blackburn claims that, since he was dressed in only a T-shirt, pants and slippers and there was no blanket, he was freezing in the detention room and unable to rest;[21] Lieutenant Kaminsky says that he saw Blackburn "resting comfortably."[22] Blackburn denies being served any breakfast or lunch except a "lukewarm" cup of black coffee;[23] Kaminsky testified that he personally served Blackburn coffee and a bun for breakfast, and another officer (Williams) said that he handed Blackburn lunch of a hamburger, a piece of pie and coffee.[24] The interrogation, according to Blackburn, consisted mainly of insults by Kaminsky;[25] Kaminsky denied insulting or "downgrading" Blackburn in any way.[26] Finally, Blackburn said that the fingerprinting was excruciatingly painful and that he yelled and complained but the guard kept forcing his left hand open;[27] Seekford admits that Blackburn "winced" because "his fingers do not appear to straighten out,"[28] but White, another witness, testified that nothing unusual happened.[29] Blackburn said that as a result of the alleged abuse, "my nerves were starting

14. Blackburn estimated the period of questioning at between three and five hours, beginning at 4:30 a.m. (E. 338–41). Kaminsky, White and Seekford all put the figure at one hour, beginning at 4:00 a.m. (E. 399–400, 415, 170, 214). Blackburn's estimates of time were obviously only rough guesses since he was in police custody and was not wearing a watch.

15. E. 222–23 (Seekford); E. 339, 341 (Blackburn).

16. E. 372–74 (Blackburn); E. 416–17 (White); E. 341 (Blackburn).

17. Blackburn places the time of this event at about 9:00 a.m. (E. 341). Kaminsky and White testified that it was around 5:00 a.m. (E. 407, 415). According to Seekford, Blackburn was first taken to the "ident room" for photographs and fingerprinting and then placed in the detention cell around 5:30–6:00 a.m. (E. 170, 214, 215–16).

18. According to Blackburn, this occurred around 10:00 a.m. (E. 342, 366–67). Kaminsky and White said that it was at 8:30 a.m. (E. 407, 401, 415, 423), but Seekford said it was at 5:00 a.m. (see note 17, *supra*).

19. E. 215 (Seekford); E. 342, 376–77 (Blackburn).

20. E. 343 (Blackburn).

21. E. 336–37, 366.

22. E. 403.

23. E. 342–43, 382, 368–69.

24. E. 400–01, 410–11.

25. E. 339–41.

26. E. 404–05, 408.

27. E. 342, 376–77.

28. E. 215.

29. E. 215 (Seekford); E. 415 (White).

to get loose, I was tired, I was cold, I was hungry."[30]

About 3:00 p. m., April 24, Trooper Wellman and two other troopers removed Blackburn from Towson Headquarters and drove him by automobile to Benson Barracks located in Bel Air, Harford County. The trip took between a half-hour and forty-five minutes, during which time Blackburn was seated in the back seat between two troopers, with his hands once again handcuffed behind him. Blackburn claims that his bad back began aching from the unnatural position in which he was forced to sit during the ride and that when they arrived at Benson Barracks, his right leg collapsed and he had to be helped out of the car and dragged or carried into the barrack.[31] Trooper Wellman testified that at one point Blackburn told him about a back injury—"something about a disk in his back, that it had slipped, or there was something the matter with some disk in his back"—but didn't recall Blackburn saying that it hurt.[32] Wellman also testified that Blackburn was walking normally except "when he'd first get out of an automobile, there would be a slight limp."[33]

When the troopers arrived with Blackburn at Benson Barracks at about 4:00 p. m., they took him directly to Lieutenant Hanley's office. Blackburn testified that he told Hanley that if there was any evidence against him, they should book him and let him have counsel and make a phone call, but Hanley replied "your record establishes you as knowing all about your rights and * * * I don't have to tell you and furthermore I don't have to tell you that you're not going to be let go."[34] According to Blackburn, Hanley said that they would keep "working" on him until they got a confession.[35] Hanley then asked Blackburn to take a lie detector test, which Blackburn agreed to do if he would be allowed a bed with a mattress, twenty-four hours rest and three good meals because, Blackburn said, "I was sick, my nerves were shot, I was tired, and I couldn't take much more." Hanley, according to Blackburn, accepted those conditions.[36]

Blackburn's version of his meeting with Hanley was disputed at trial. Lieutenant Hanley was not called to testify, but Trooper Wellman said: "When we went in, Lieutenant Hanley advised Blackburn of his rights. Blackburn at that time interjected and said he was familiar with his rights, and Lieutenant Hanley completed advising him of them nevertheless."[37] However, Wellman's recollection of what that advice consisted of was not completely clear:[38]

(The Witness) When we first went in, Lieutenant Hanley said Earl Blackburn,—I don't remember the exact words.

Q. (Mr. Harlan [the Prosecutor]) Paraphrase it, as best you can recall?

A. He said it is my duty to inform you that anything you might say or do might be used against you in Court, and—I don't—I know he was advised of his rights, but I don't remember the exact wording, and Blackburn interjected in that and said he was familiar with his rights and that the lieutenant didn't have to tell him, but the lieutenant completed it, saying we weren't going to promise him anything, that it wouldn't be held against him if he didn't say anything, and that's about all I recall.

There was no testimony introduced that Blackburn was advised by Hanley or anyone else at Benson Barracks of his right to counsel or that he had a right to a preliminary hearing before a state magistrate.

30. E. 341. *See also* E. 342–43, 382.

31. E. 343–46.

32. E. 259–60.

33. E. 250.

34. E. 346.

35. E. 380.

36. *Ibid.;* E. 379.

37. E. 237.

38. E. 238.

Following the interview with Hanley,[39] Blackburn was placed in a detention cell which had two metal bunks with blankets but no toilet facilities. A trooper asked Blackburn where he could pick up Blackburn's clothes, and Blackburn asked the trooper to see his wife and obtain the clothes. The clothes (shoes, socks, underwear, a shirt and a jacket) were brought back two hours later.[40] Blackburn rested in his cell until about 8:00 p. m., when Wellman and Seekford took him to Barrack F at North East in Cecil County. Wellman testified that Blackburn was served lunch and dinner while at Benson, but this is denied by Blackburn.[41]

During the trip by auto from Benson to North East, Blackburn's hands were once more handcuffed behind his back and, according to him, he complained of his back and leg during the trip, but to no avail—and again, according to Blackburn, he had to be helped out of the car and into Barrack F.[42] Seekford denied that any complaints were made.[43]

Upon arriving at North East, Blackburn was put directly into a basement detention cell without any interrogation.[44] The cell contained toilet facilities and a bed with a mattress and blanket. Blackburn was left alone until at least 8:00 a. m. the next morning.[45] Blackburn testified that a sandwich and a glass of milk were brought to him in the evening—the first food, according to him, served to him since his arrest nineteen hours before—but he testified he was too sick to retain it and vomited it into the toilet.[46] He also said that he had such great pain in his back and leg that he could not sleep all night, nor could he walk at all on his right leg.[47] Blackburn testified that he was brought breakfast in the morning (described by him as bread and a "cold and greasy" egg), which he also threw up.[48]

At about 10:00 a. m., the interrogation at North East began. The testimony regarding this interrogation is for the most part uncontradicted. Blackburn was taken to the polygraph room where Sergeant Stacey told him that he was suspected of participation in the Joppa Road crime, informed him of his right to remain silent and asked him if he would agree to take a lie-detector test.[49] Blackburn replied in the affirmative. Blackburn was not advised of his rights to a lawyer and to a preliminary hearing. Stacey testified that he asked Blackburn "over and over" if there were any physical or mental disorders, and Blackburn replied negatively.[50] On the other hand, Trooper Wellman, who had stationed himself in the adjacent observation room where he was able to hear the entire interrogation, did not recall any question asked about Blackburn's physical or mental condition.[51] The lie-detector test was administered by Stacey,[52] and Blackburn was then (around noon) given two sandwiches and a glass of milk for lunch. He ate and retained a sandwich and the

---

39. Blackburn did not say how long the interview lasted; Wellman said that it took only ten to fifteen minutes (E. 238).

40. On direct examination, Blackburn said that he was in the detention cell about an hour before the trooper inquired about providing clothes (E. 347), but on cross-examination he testified that this occurred immediately after he was placed in the cell (E. 380).

41. E. 238, 254–61; E. 379.

42. E. 347–48.

43. E. 198–99.

44. E. 220, 240, 309–10. Seekford testified that Stacey accompanied Blackburn to the basement cell (E. 220), but Stacey, who said that Blackburn was walking normally, testified that Seekford and Wellman took him downstairs (E. 309).

45. E. 349 (Blackburn).

46. E. 349.

47. *Ibid.*

48. *Ibid.*

49. E. 310–11, 350.

50. E. 311–12.

51. E. 242.

52. E. 350 (Blackburn). Stacey did not specifically say in his testimony that a lie-detector test was administered, but he did refer at one point (in a different context) to a polygraph release that Blackburn signed (E. 329).

milk.[53] The interrogation then resumed with Stacey announcing that the lie-detector test "showed a little deception."[54] Then, as Seekford had done before, Stacey repeatedly went over details of the Joppa Road crime and asked Blackburn to confess.[55] The crux of Stacey's interrogation, as testified to by Blackburn, was uncontradicted at the trial:[56]

A He went repeatedly over this Baltimore County murder and this Joppa murder, the same thing that Seekford had been trying to get on me to admit and say that I did it.

Q And how long did that go on, if at all?

A It was about three or four hours.

Q And then what occurred, if anything?

A In this interrogation, Sergeant Stacey kept telling me Mefford was accusing me of murder and that he was going to get on the stand and put this gun in my hand and what was a jury going to say when he did this. He kept repeating this statement over and over and kept threatening me that I was going to the gas chamber because that's exactly where a jury was going to take and send me when Mefford got on the stand and accused me of this murder, and I kept repeatedly telling them I cannot tell you something I don't know and something that I haven't done, and I asked him again if I was to be charged with this murder, to please do so and let me have an attorney. He said a lawyer is going to do you no good, he said, because the jury is going to put you where you belong.

Blackburn also testified as follows:[57]

Q Mr. Blackburn, who said to you, if anyone, that Mefford was making a bid for his life by giving a statement and that you should make a bid for your life by giving a statement?

A Sergeant Stacey.

Q When was that statement made by Sergeant Stacey?

A Sergeant Stacey made this statement to me several times in questioning me. He kept telling me that Mefford was making a bid for his life and accusing me of this murder and what was a jury going to do when he got on the stand and put this gun in my hand and accused me of this murder, and the only way that I was ever going to save myself was to make a statement, and I told him that I could not say that I did something when I didn't, something like that I was not involved in, and he kept telling me this statement over and over and he said Mefford is making a bid for his life, you make a bid for yours, it's the only way you're going to save yourself.

Blackburn says his "head was throbbing" and he "couldn't think straight any more," but he still would not confess.[58] Blackburn testified as follows concerning this interrogation during its late afternoon stage:[59]

They kept threatening me. I couldn't think straight any more. I hit the desk and I told them I couldn't say anything because I had been threatened with threats to my daughter and I could not say anything because of her, and if Mefford was accusing me, why didn't he—

(Mr. Brown [the Defense Attorney]) Now just a minute. Try to get yourself together. Will the stenographer read back what you've taken, if you can?

(Thereupon, the stenographer read the last answer back.)

(The Witness) He kept repeating this statement over to me. He kept telling me that in his statement, there was five kids, this case could not be settled, because this woman could not get any relief, any money, until they

53. E. 350, 312, 325, 256.
54. E. 351 (Blackburn).
55. *Ibid.*
56. E. 351–52.
57. E. 358.
58. E. 362.
59. E. 352–53.

could produce a second man, and I told them that I could not say that I did something that I did not do.

Q (Mr. Brown) What woman were they referring to that couldn't get any relief?

A This dead man's wife. I think his name is Snider. They referred to his name over and over.

Q All right. Now, what happened after that, if anything?

A Then he went into this threat again about the gas chamber, and I hit the desk with my hand and told them that I would not put my daughter on a limb for them or nobody else, because prior to my arrest I had been threatened and had knowledge of a Baltimore County murder because of my car, and I told them if they had any evidence to please book me and let me get rid of this confusion in my mind, and that if Mefford was accusing me, why wasn't he brought before me to accuse me, why did they keep accusing me, and, if they had such evidence, why didn't they book me, and I said I wanted to see my wife to make sure that she was all right and that no harm had come to my daughter.

None of this testimony was disputed by any witness at trial.

Stacey said that he would bring Mefford and Blackburn's wife, and the interrogation was suspended.[60] Blackburn was returned to the detention cell and fed dinner.[61] At about 6:30 p. m. Mefford was brought in and faced Blackburn through the front of the cell. Stacey began reading the statement Mefford had previously given to the police,[62] but Blackburn interrupted and said, "I've heard enough, that's enough, that makes it easier for me to do what I've got to do now."[63] Then Blackburn turned to Mefford and asked him, "Why did you accuse me, why did you involve me?" and Mefford replied, "I'm sorry, Black."[64] Mefford was then taken away.

Next came Blackburn's meeting with his wife. Blackburn was taken to a small room and seated opposite his wife at a small desk. Stacey, Seekford and White remained in earshot at Mrs. Blackburn's request.[65] Blackburn's wife was crying and was extremely upset while she talked to him.[66] She told him that she had been interrogated for four or five hours by the police who were trying to get her to admit that she wasn't able to recall whether Blackburn stayed home the night of the crime.[67] There is little agreement concerning the rest of the conversation. According to Blackburn, there was no mention of the crime.[68]

60. E. 353 (Blackburn); E. 314 (Stacey).

61. Both Stacey and Wellman testified that the meal consisted of steak and vegetables (E. 315, 246), but Blackburn said he remembered being served a small piece of salty, burnt meat plus a glass of milk and "something else" (E. 390–91).

62. Blackburn testified that Mefford refused to read the statement so Stacey did instead (E. 355). Stacey also said that he read the statement (E. 315), and Seekford agreed (E. 195), but Wellman thought that Mefford himself read it (E. 246–47). On cross-examination, Wellman stated that he could have been mistaken (E. 258).

63. Each of the police officers present testified that Blackburn said words to that effect [E. 315 (Stacey); E. 246–47 (Wellman); E. 195 (Seekford)]. Ac-

cording to Blackburn, he asked Stacey if the statement being read was just what the police had been telling him all along, and Stacey said yes (E. 354).

64. This is from Blackburn's testimony (E. 355). Stacey testified that "it's possible" that Blackburn said to Mefford, why did you pin this on me. Stacey did remember Mefford's answer: "I'm sorry, Black" (E. 327).

65. E. 316 (Stacey). *Compare* E. 196 (Seekford).

66. E. 355 (Blackburn); E. 433 (Stacey); E. 421 (Wellman). At another point, Wellman said that "her eyes were red, as if she were about to cry, perhaps" (E. 426).

67. E. 355 (Blackburn).

68. E. 355.

But Stacey testified that he overheard Blackburn say that "he and Fred Mefford did the thing that happened at this Save service station at Joppa, and that he did it to protect his wife and daughter Debbie, that if he hadn't been involved, hadn't done it, something terrible was going to happen to Debbie" ; then Mrs. Blackburn "began to cry, and she said if he had stayed home, where he belonged with her and Debbie, why it would not have happened. * * * "[69] Seekford also said that he overheard some discussion of the crime but could only remember Mrs. Blackburn asking her husband "why he did it, and she stated there was no reason to kill the man."[70] Finally, there was White's testimony that Mrs. Blackburn said "she wished Earl would have stayed home and not run around with Mefford, because he was breaking her home up"; her only remark about the Joppa crime was "that she didn't think that he would do such a thing, if he did."[71]

Blackburn's conversation with his wife took only about fifteen minutes and, around 8:00 p. m., she left, still in tears. At that point, Blackburn testified:

> I called to Corporal Seekford who was standing in the doorway, and said I would say anything, just leave her alone. I'd say anything they wanted me to, I didn't care what it was, because I was going crazy * * * and I did say the things they wanted me to say, not what was the truth, because I couldn't take it any longer. * * * I answered the questions the way that they wanted me to, sir, to get some kind of relief.[72]

Blackburn then confessed, first orally and then in a written statement. When he gave the confession, Blackburn cried and appeared to Detective White to be "emotionally unstable."[73]

### III.

28 U.S.C. § 2254(d) provides that "a determination after a hearing on the merits of a factual issue" in a state court is presumed correct unless, among other things, "the record in the state court proceedings, considered as a whole, does not fairly support the conclusion reached." In the instant case, the trial court made few factual determinations aside from its ultimate finding of voluntariness. The only subsidiary findings of fact made by the trial court are found in the following portion of its oral opinion:[74]

> As to the statement itself, the Court has already decided, and it will reiterate again, that it found no—nothing unusual done by either the State Police or the Baltimore County Police to get a confession from this defendant. The testimony of all involved, except the defendant, are that he was fed, that he was granted the two requests, one, to be confronted by Mefford, and to see his wife. At no time was he asking for counsel, which was corroborated by Blackburn, who said if you've got anything on me, book me, and I'll get counsel. * * *

Much of the disputed testimony in the record concerns the physical treatment of Blackburn by the police. On direct appeal, the Court of Appeals of Maryland reviewed that testimony and concluded:

> There was no unduly long questioning, no persistent hammering by relays of officers, no physical mistreatment, no deprivation of rest or food.

69. E. 426, 429.

70. E. 196, 230.

71. E. 422, 426.

72. E. 355-56.

73. On direct examination, White said that Blackburn "seemed to be upset" but was coherent (E. 419). The following was developed on cross-examination (E. 425):
Q When you say that at the time of taking the statement of the defendant he was upset, what do you mean by being upset?
A He cried, emotionally unstable.
Q Anything else?
A No, sir.
Q Cried and was emotionally unstable, is that right?
A He appeared so.

74. E. 456.

\* \* \* [Blackburn] was [not] held incommunicado. \* \* \* Blackburn's wife was told where he was when the State trooper went to see her to get clothing, and she was brought to see him. The transfers of [Blackburn] from station to station were all made for legitimate purposes \* \* \* [235 Md. at 512, 201 A.2d at 831].

The Court of Appeals thus resolved the disputed testimony relating to Blackburn's claims that he was physically abused in favor of the State, thereby agreeing with the trial court that there was "nothing unusual" done by the police. Blackburn asks this Court to draw the opposite conclusion, urging that it is undisputed that Blackburn has a deformed hand and was subjected to pain in the handcuffing and fingerprinting; that Blackburn normally wears a brace for his back but did not have it during the interrogation; that he told Wellman about his back injury and Wellman remembered him "limping"; that he "rested" for a night on a solid metal bunk while scantily dressed; and that there was a crucial conflict between Stacey and Wellman as to whether Stacey asked Blackburn about his physical and mental condition—and that all these facts lend credence to Blackburn's allegations of physical coercion. On the other hand, there is the explicit testimony of each police officer that Blackburn never complained of his physical treatment, as well as the fact that the fingerprinting and the use of the metal bunk occurred early during the period of confinement and interrogation and were not repeated.

 This Court accepts the state court findings on physical facts as supported by the record as a whole. There remains, however, the question of whether Blackburn's confession was coerced by psychological pressures. "There is torture of mind at well as body; the will is as much affected by fear as by force."

Watts v. Indiana, 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801 (1949) (opinion of Mr. Justice Frankfurter). That psychological coercion is oftentimes more subtle than physical force does not make it less real to the accused; nor can the courts ignore it. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). The testimony concerning the factors that are relevant to a determination in this case of whether Blackburn's will was overborne—e. g., the illegal detention, the felony-murder doctrine and the police tactics used in connection with it, the lack of warning that petitioner could have legal help, and petitioner's expressions of a desire to be booked and to be permitted counsel—is virtually undisputed on the record and is established by a consideration of "the evidence of the prosecution's witnesses and so much of the evidence for the defense as, fairly read in the context of the record as a whole, remains uncontradicted." Culombe v. Connecticut, 367 U.S. 568, 604, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). See Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); Clewis v. Texas, 386 U.S. 708–709, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967). Against this factual background the question arises of "how the accused reacted to the external facts" and "the legal significance of how he reacted" to them. Culombe v. Connecticut, *supra* at 604 of 367 U.S., at 1880 of 81 S.Ct. And although petitioner's in-custody response to the interrogation is necessarily of a subjective order, certain basic objective factors have relevance in ascertaining subjective facts. Greenwald v. Wisconsin, *supra*; Clewis v. Texas, *supra*; Johnson v. New Jersey, *supra* at 730 of 384 U.S., 86 S.Ct. 1772, 16 L.Ed.2d 882; Haynes v. Washington, 373 U.S. 503, 513–514, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). See Harris v. South Carolina, 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949).[75] An ex-

75. In *Culombe*, Mr. Justice Frankfurter described a three-phased process to be used in passing upon the voluntariness of a confession:

First, there is the business of finding the crude historical facts, the external, "phenomenological" occurrences and events surrounding the confession. Sec-

amination of those objective factors leads to the ultimate question in this case: was Blackburn's confession the product of an overborne will?

## IV.

### A. *The Illegal Detention*

Blackburn was held in police custody and interrogated for over two days without being brought before a judicial officer. This was in direct violation of the long-established common law and statutes of Maryland. In 1896, in a false imprisonment tort case, the Maryland Court of Appeals said:

> It cannot be questioned that when a person is arrested either with or without a warrant, it becomes the duty of the officer or the individual making the arrest to convey the prisoner in a reasonable time and without unnecessary delay, before a magistrate, to be dealt with as the exigency of the case may require. The power to make the arrest does not include the power to unduly detain in custody; but on the contrary is coupled with a correlative duty, incumbent upon the officer, to take the accused before a magistrate "as soon as he reasonably can." [Kirk & Son v. Garrett, 84 Md. 383, 407, 35 A. 1089, 1092].

■ Under Maryland statutory law, the State Police have the same power as the local police to arrest a suspect in any municipality of the State when the alleged crime was committed outside of the limits of that municipality. The applicable statutes in effect in 1962 are set forth in Ann.Code of Md. (1957), Art. 88B, §§ 20, 23(a). The State Police who arrested Blackburn in Baltimore City were thus bound by the mandate of the following statute:

> Whenever any person shall be arrested in the City of Baltimore upon any criminal charge, or for the violation of any law of this State, or of any ordinance of the mayor or city council of Baltimore (other than motor vehicle charges) it shall be the duty of the police officer or constable making such arrest, or in whose custody the person

---

ond, because the concept of "voluntariness" is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal, "psychological" fact. Third, there is the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances * * * [367 U.S. at 603, 81 S.Ct. at 1879].

This statement of general principles was accepted by a majority of the Court, although the majority divided on its application to that case. *See id.* at 642, 81 S. Ct. 1860. The standard itself has never been explicitly overruled, but in more recent cases the Supreme Court has appeared to place greater reliance on objective factors in the application of law to fact at the second and third stages of the inquiry. Mr. Justice Frankfurter also stated in *Culombe* that where no explicit finding of fact has been made by the state courts, all doubts must be resolved in favor of the State and the federal courts cannot look beyond uncontradicted testimony in the record. In the *Clewis* and *Greenwald* cases, the uncontradicted evidence itself established the involuntariness of the confessions in question, and it was unnecessary for the Court to go any further. There may be an implication in those cases that the federal courts may resolve disputed testimony on the basis of the entire record when that has not been done by the state courts. Moreover, neither Justice Frankfurter's opinion in *Culombe* nor the standard for habeas corpus review set forth in 28 U.S.C. § 2254 (d) draws a clear distinction between findings made by a state trial court and a state appellate court. Because the latter cannot view the demeanor of the witnesses and draw inferences of credibility therefrom, it may be argued that findings of fact made by the state appellate court should not preclude an independent determination by the federal habeas court. In any event, while this Court is aware of those difficulties in articulating an explicit standard of review from the case law, this Court accepts the subsidiary findings of fact of both the two nisi prius judges who presided at Blackburn's trial and of Judge Hammond speaking for the majority of the Court of Appeals, and does not make any new findings of fact from disputed testimony.

arrested may be, to take such person before a judge of the criminal division of the Municipal Court of Baltimore City, and if any offense charged against the person arrested is beyond the jurisdiction of the court, the judge of the criminal division shall sit as a committing magistrate * * * *provided that all .persons charged with murder, manslaughter, or manslaughter by automobile shall be taken by the police officer making the arrest, or in whose custody the person arrested may be, before a judge of the criminal division of the Municipal Court sitting at that location of the criminal division (except the housing part) which is closest to the office of the State's Attorney of Baltimore.* (1961, ch. 616, § 1). [*Id.* (1966 Replacement Volume), Art. 26, § 115; emphasis added].

Blackburn was taken to the headquarters of the Baltimore County Police Department in Towson and held there for over twelve hours, then taken to Harford County and finally to Cecil County where he gave the confession. In none of those places did the police bring him before a magistrate; Blackburn was first taken before a judicial officer more than two months after his arrest, when he appeared in the Circuit Court for Harford County.[76]

The State has argued:

* * * The facts which justify an arrest on probable cause to believe that a felony has been committed by the accused may not in all instances be sufficient for a preliminary hearing. In a situation where the accomplice had named the Petitioner as a participant and the accomplice's story had been checked by the police, there was

sufficient cause to arrest, but if the accomplice refused to testify at a preliminary hearing, the police would not have had sufficient evidence to charge the Petitioner. The police, therefore, had every reason to question the Petitioner in order to have him either affirm or deny the allegations made by the accomplice. In all cases this enables an accused to present his side of the story before he is charged. * * * [77]

The suggestion is that the police should be permitted to interrogate a suspect against whom they may have no evidence of any legal force for an indeterminate period of time. That approach clearly is not permitted by Article 26, § 115. Further, as stated in Williams v. State, 214 Md. 143, 154, 132 A.2d 605, 611 (1957), a magistrate, presiding at a preliminary hearing, "can only commit the accused for appearance before the grand jury, subject to bail under certain circumstances, or discharge him." Thus, one of the protections which results from the holding of a preliminary hearing is that a suspect against whom a prima facie case cannot be established is set free—and that the determination of when the period of detention of a suspect shall end is made by a judicial officer and not solely by the police.

Moreover, this argument of the State in this case highlights the fact, which is inescapable from the record, that the accusatory process had sharply focused on Blackburn when he was taken in custody. Had he been then taken before a judicial officer and charged with murder, he certainly would have been warned of the jeopardy that he was in; and he would have either been afforded free counsel or allowed immediately to communicate with a retained lawyer.[78] The

76. E. 1.

77. Respondent's Brief on Petition for Writ of Certiorari in the Supreme Court, at 21. No legal authority is cited in support of this position.

78. Blackburn's arrest, confinement and trial all took place in 1962, which was before the Supreme Court's decision in Gideon

v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). However, respondent does not suggest that legal help would not have been furnished to Blackburn at a preliminary hearing in 1962. *See Mefford and Blackburn v. State, supra,* 235 Md. at 509, 201 A.2d 824. *See also* Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); Hill v. State, 218 Md. 120, 145 A.2d 445 (1958),

failure of the police to do so can only be explained as the State has suggested in its argument—the police did not want a preliminary hearing to interfere with their efforts to secure a confession because the evidence they possessed would not pass judicial scrutiny. In Spano v. New York, 360 U.S. 315, 324, 79 S.Ct. 1202, 1207, 3 L.Ed.2d 1265 (1959), in discussing the role played by a police interrogator who was a "childhood friend" of Spano, who was instructed by his superiors "falsely" to make certain statements to Spano, the Supreme Court said:

> [The police] were rather concerned primarily with securing a statement from the defendant on which they could convict him. The undeviating intent of the officers to extract a confession from petitioner is therefore patent. When such an intent is shown, this Court has held that the confession obtained must be examined with the most careful scrutiny * * *.

■ If Blackburn were a federal prisoner, the violation by the police of their duty to bring him before a judicial officer would by itself result in the inadmissibility of his confession.[79] This *per se* rule has not been held to apply to criminal prosecutions in state courts.[80] But in assessing whether Blackburn's confession was voluntary, his detention contrary to the explicit law of Maryland is an important factor. *See* Clewis v. Texas, *supra* at 711 of 386 U.S., 87 S.Ct. 1338; Davis v. North Carolina, *supra*; Collins v. Beto, 348 F.2d 823, 834 (5th Cir. 1965) (concurring opinion of Friendly, J., sitting by designation).

### B. *Blackburn's Desire for, and Lack of, Counsel*

Blackburn told the police at each place of interrogation that if they had anything on him, to book him and charge him and let him get a lawyer.[81] The police response each time was to ignore the statement; Blackburn was never told that he had a right to the assistance of counsel and that if he could not afford a lawyer he would be provided one by the State.

It may well be that Blackburn's repeated statements do not on their face amount to a specific request for counsel. *See* Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969). *See also* Mefford and Blackburn v. State, 235 Md. *supra* at 513, 201 A.2d 824. And it may be that he did not think that, as an indigent, he could obtain counsel until he was booked. See *id.* at 509, 201 A.2d 824. But Blackburn did repeatedly express his desire for legal help. And if Blackburn did in fact think that he could not get legal help until he was booked, the police did nothing to disabuse him of that false notion.

In Greenwald v. Wisconsin, *supra*, the defendant responded to a police request to write out a confession by "stating that 'it was against my constitutional rights' and that he was 'entitled to have a lawyer.'" 390 U.S. at 520, 88 S.Ct. at 1153, 20 L.Ed. 2d 77. No other reference to counsel was made during the interrogation, and the suspect was not afforded legal help before he confessed. The Supreme Court said that relevant to the issue of voluntariness was "the lack of

and former Rule 723(b)–(c) quoted in the latter opinion, with regard to the requirement of the assignment of counsel in capital cases.

**79.** Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943). *See* Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**80.** *See* Clewis v. Texas, *supra* at 711, n. 7 of 386 U.S., 87 S.Ct. 1338; United

States v. Schwartz, 372 F.2d 678, 682 (4th Cir. 1967); Jacobs v. Warden, 367 F.2d 321, 323 and n. 2 (4th Cir. 1966); Ralph v. Pepersack, 335 F.2d 128, 136, n. 11 (4th Cir. 1964), cert. denied, 380 U.S. 925, 85 S.Ct. 907, 13 L.Ed.2d 811 (1965); *cf.* Outing v. North Carolina, 383 F.2d 892 (1967), cert. denied, 390 U. S. 997, 88 S.Ct. 1201, 20 L.Ed.2d 96 (1968).

**81.** That is, in Towson (E. 222–23, 339, 341), in Benson (E. 346), and in North East (E. 351–53).

counsel, especially in view of the accused's statement that he desires counsel, *see* Johnson v. New Jersey, 384 U.S. 719, 730, 735, 86 S.Ct. 1772, 1779, 1781, 16 L.Ed.2d 882 (1966); *cf.* Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)." *Id.* at 521, 88 S.Ct. at 1154. Blackburn's desire for counsel was expressed more often and in much clearer terms than Greenwald's.

■ Obviously, Blackburn's statements indicating a desire for counsel were not wholly unambiguous, linked as they were with a demand to be booked. Thus, there was lacking the type of unqualified request for counsel made in *Escobedo*. In Frazier v. Cupp, *supra*, the petitioner said once, in the course of the confession itself, "I think I had better get a lawyer before I talk any more." Noting that Frazier's remark could have been considered by the interrogating policeman "as a passing comment" since Frazier "did not pursue the matter, but continued answering questions," the Supreme Court held: "In this context, we cannot find the denial of the right to counsel which was found so crucial in *Escobedo*." 395 U.S. ——, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684, 693. Under the circumstances of this case, even though Blackburn strenuously "pursue[d] the matter," his Sixth Amendment rights may not have been violated under *Escobedo* and *Frazier*.[81A] But his repeated, unheeded requests to be booked and permitted to consult with a lawyer are relevant facts to be weighed in the context of determining whether or not his confession was voluntary and meets Fifth Amendment standards.

### C. *The Felony-Murder Situation*

In order to secure conclusive evidence with regard to the murder charge, the police did *not* have to obtain a confession from Blackburn that he shot Snider. Because of the felony-murder rule, an admission by Blackburn that he participated in the robbery was enough to convict him of murder. The record is clear that the police made Blackburn believe that his only hope to save his life was to confess to the robbery and at the same time to deny that he did the actual shooting. The record is full of Blackburn's testimony, which was in no way contradicted at trial by any witness, that the police told him:

> Mefford is making a bid for his life, you make a bid for yours, it's the only way you're going to save yourself. [E. 358].

> Mefford was accusing me of murder and that he was going to get on the stand and put this gun in my hand. [E. 351]. [See almost the same words at E. 358].

> I was going to go to the gas chamber because that's exactly where a jury was going to take and send me when Mefford got on the stand and accused me of this murder. [E. 351].

> A lawyer is going to do you no good, because a jury is going to put you where you belong. [E. 351–52].

> What do I think a jury was going to say when Mefford accused me in a Court of this murder. [E. 352].

> The only way I was ever going to save myself is to make a statement. [E. 358].

What Blackburn was not told was that to "put the gun" in Mefford's hands was to put himself in the lap of the felony-murder rule.

There is no evidence that Blackburn knew of the felony-murder rule. Nor is there any reason why he as a layman would have known of it.[82] After Mef-

---

**81A.** While *Escobedo* is not in and of itself applicable herein, the *Escobedo* standards are relevant in connection with assessing whether Blackburn's confession is voluntary. Davis v. North Carolina, *supra;* Johnson v. New Jersey, *supra*. See the discussion *supra* at p. 8 of this opinion.

**82.** *Cf.* Escobedo v. Illinois, 378 U.S. 478, 486, 84 S.Ct. 1758, 1762, 12 L.Ed.2d 977 (1964): "Petitioner, a layman, was undoubtedly unaware that under Illinois law an admission of 'mere' complicity in the murder plot was legally as damaging as an admission of firing of the fatal shots." In his dissenting opinion, Mr. Justice

ford was brought to see him, he knew that Mefford had in fact confessed and had "put the gun in his hands" ("I'm sorry, Black"). And talking to his wife must have left little doubt in Blackburn's mind that his wife was hardly going to provide him with a reliable alibi.

Blackburn was warned twice by the police that he had a right to remain silent. But the police also advised that silence on his part meant facing a murder conviction. What Blackburn of course needed was a lawyer's advice. Any lawyer would have told him far more than simply that he had a right not to talk. A lawyer would have admonished him that admitting to any participation in the robbery was equivalent to confessing to murder, and that contrary to what the police were advising him, and what he clearly believed when he confessed, his situation was not hopeless. In that connection, a lawyer almost surely would have explained to Blackburn that Mefford's written confession was hearsay and could not be used in a trial against Blackburn unless Mefford took the stand; that Mefford might well decide that it was not in his (Mefford's) best interest to testify against Blackburn

(which was in fact apparently what happened); and that even if Mefford did testify, if there was no other incriminating evidence, it would be only Mefford's word against Blackburn's and a trier of fact might believe Blackburn.

Had Blackburn been taken before a magistrate as required by Maryland law, or had his repeated expressions of desire for booking and a lawyer been granted, then he would have received the legal help he needed. But the police ignored both Blackburn's repeatedly expressed wish for booking and counsel and their explicit duty to take him before a judicial officer.

█ Given the impact of these three factors acting in concert—the illegal detention; Blackburn's repeated desire for booking and counsel; and the felony-murder doctrine and its use or misuse by the interrogators—this Court concludes that, under the totality of the circumstances, Blackburn's incriminating statements were not the product of his free and rational choice, and were given involuntarily, and that their admission into evidence at Blackburn's trial violated the due process clause of the Fourteenth Amendment.[83] Blackburn's

White said: "Cases in this Court, to say the least, have never placed a premium on ignorance of constitutional rights. If an accused is told he must answer and does not know better, it would be very doubtful that the resulting admissions could be used against him. When the accused has not been informed of his rights at all the Court characteristically and properly looks very closely at surrounding circumstances." *Id.* at 499, 84 S.Ct. at 1769.

83. Counsel for Blackburn have argued that there are three other and additional factors relevant to a finding of involuntariness: (1) Blackburn's physical treatment; (2) the advice, or lack of advice, given with respect to Blackburn's constitutional rights; and (3) Blackburn's meetings with his wife and with Mefford. Those events are of course part of the totality of the circumstances and are relevant in that regard. But, in and of themselves, none of those three factors, in this Court's opinion, constitute an independent ground for relief. As stated, *supra*, this

Court accepts the state courts' finding of lack of physical abuse or of significant mistreatment by the police. Accepting the police testimony, this Court finds that Blackburn was advised of his right to silence but not of his right to a lawyer or to a preliminary hearing. The failure to advise of the rights to counsel and a preliminary hearing may in some cases have independent force in and of themselves. In this case, however, they are relevant only insofar as they are connected with three factors discussed in the text —i. e., the illegal detention, Blackburn's desire for booking and counsel, and the felony-murder aspects. Finally, this Court puts no independent weight on Blackburn's meetings with his wife and Mefford. Once again accepting the police testimony of those events (and reconciling as much as possible the self-contradictions therein), this Court finds nothing *per se* coercive in those meetings. They were held at Blackburn's request. The confrontation with Mefford confirmed to Blackburn what he had been told—that

petition for writ of habeas corpus is therefore granted.[84] The State will be required to release Blackburn from custody unless it elects to retry him and does so within a reasonable time. Counsel are directed to prepare an appropriate order.

This Court wishes to express its appreciation to Blackburn's counsel for their tireless representation of him and to counsel on both sides of the case for their most thorough and helpful factual and legal research.

Mefford had confessed and had accused Blackburn of murder. The meeting with his wife was definitely upsetting to both, but the reason for their distress according to the police, was that Blackburn recognized his situation as hopeless.

84. While the direct appeals of Mefford and Blackburn from their convictions were characterized by Judge Hammond as being based upon "many common facts" and calling for "evaluation of, and decision on, similar principles," 235 Md. *supra* at 501, 201 A.2d at 825, Judge Hammond, 235 Md. *supra* at 516, 201 A.2d 824, and

Judge Thomsen, 270 F.Supp. *supra* at 753, noted that Mefford knew of his right to counsel but never even hinted that he desired a lawyer. Also, Mefford's arrest was deemed illegal, and Blackburn's arrest, legal, by the Court of Appeals of Maryland, 235 Md. *supra* at 511, 201 A.2d 824. Since disposition of Mefford's pending appeal in the Fourth Circuit may well not be dispositive of the issues herein presented, this Court does not believe it appropriate to withold its within decision pending the outcome of Mefford's appeal from Judge Thomsen's denial of relief.